METROPOLITAN LIFE INSURANCE CO. ET AL. *v.*
WARD ET AL.

No. 83–1274.   Argued October 31, 1984—Decided March 26, 1985

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, and STEVENS, JJ., joined. O'CONNOR, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and REHNQUIST, JJ., joined, *post*, p. 883.

*Matthew J. Zinn* argued the cause for appellants. With him on the briefs was *Steven Reed.*

*Warren B. Lightfoot* argued the cause for appellees. With him on the brief for appellee Ward were *E. Mabry Rogers* and *Phillip E. Stano. Robert W. Bradford, Jr.,* and *Harry Cole* filed a brief for appellees American Educators Life Insurance Co. et al.*

---

*Briefs of *amici curiae* urging reversal were filed for the State of Connecticut et al. by *Dennis J. Roberts II,* Attorney General of Rhode Island, *Frances X. Bellotti,* Attorney General of Massachusetts, *Gregory H. Smith,* Attorney General of New Hampshire, *Joseph I. Lieberman,* Attorney General of Connecticut, *Elliot F. Gerson,* Deputy Attorney General, and *John G. Haines,* Assistant Attorney General; and for the Life Insurance Council of New York by *Peter J. Flanagan.*

Briefs of *amici curiae* urging affirmance were filed for the State of Alaska et al. by *Anthony Celebrezze, Jr.,* Attorney General of Ohio, and *Connie J. Harris,* Assistant Attorney General, *Dave Frohnmayer,* Attorney General of Oregon, *William F. Gary,* Deputy Attorney General, and *James E. Mountain, Jr.,* Solicitor General, *Jim Mattox,* Attorney General of Texas, and *Henry H. Robinson,* Assistant Attorney General; for the State of Illinois by *Neil F. Hartigan,* Attorney General, and *Patricia Rosen* and *Kathryn A. Spalding,* Assistant Attorneys General; for Allstate Insurance Co. et al. by *Duane C. Quaini;* for the Florida Association of

JUSTICE POWELL delivered the opinion of the Court.

This case presents the question whether Alabama's domestic preference tax statute, Ala. Code §§ 27-4-4 and 27-4-5 (1975), that taxes out-of-state insurance companies at a higher rate than domestic insurance companies, violates the Equal Protection Clause.

I

Since 1955,[1] the State of Alabama has granted a preference to its domestic insurance companies by imposing a substantially lower gross premiums tax rate on them than on out-of-state (foreign) companies.[2]  Under the current statutory provisions, foreign life insurance companies pay a tax on their gross premiums received from business conducted in Alabama at a rate of three percent, and foreign companies selling other types of insurance pay at a rate of four percent. Ala. Code § 27-4-4(a) (1975).  All domestic insurance companies, in contrast, pay at a rate of only one percent on all types of insurance premiums.   § 27-4-5(a).[3]  As a result, a foreign

Domestic Insurance Companies, Inc., et al. by *Robert W. Perkins* and *Samuel R. Neel III.*

[1] The origins of Alabama's domestic preference tax statute date back to 1849, when the first tax on premiums earned by insurance companies doing business in the State was limited to companies not chartered by the State. Act No. 1, 1849 Ala. Acts 5.  A domestic preference tax was imposed on and off throughout the years until 1945, when the State restored equality in taxation of insurance companies in response to this Court's decision in *United States* v. *South-Eastern Underwriters Assn.*, 322 U. S. 533 (1944). Act No. 156, 1945 Ala. Acts 196–197.  In 1955, the tax was reinstated, Act No. 77, 1955 Ala. Acts 193 (2d Spec. Sess.), and with minor amendments, has remained in effect until the present.

[2] For domestic preference tax purposes, Alabama defines a domestic insurer as a company that both is incorporated in Alabama and has its principal office and chief place of business within the State.  Ala. Code § 27-4-1(3) (1975).  A corporation that does not meet both of these criteria is characterized as a foreign insurer.  § 27-4-1(2).

[3] There are two exceptions to these general rules concerning the rates of taxation of insurance companies.  For annuities, the tax rate is one percent for both foreign and domestic insurers, Ala. Code § 27-4-4(a)

insurance company doing the same type and volume of business in Alabama as a domestic company generally will pay three to four times as much in gross premiums taxes as its domestic competitor.

Alabama's domestic preference tax statute does provide that foreign companies may reduce the differential in gross premiums taxes by investing prescribed percentages of their worldwide assets in specified Alabama assets and securities. § 27–4–4(b). By investing 10 percent or more of its total assets in Alabama investments, for example, a foreign life insurer may reduce its gross premiums tax rate from 3 to 2 percent. Similarly, a foreign property and casualty insurer may reduce its tax rate from four to three percent. Smaller tax reductions are available based on investment of smaller percentages of a company's assets. *Ibid.* Regardless of how much of its total assets a foreign company places in Alabama investments, it can never reduce its gross premiums tax rate to the same level paid by comparable domestic companies. These are entitled to the one-percent tax rate even if they have no investments in the State. Thus, the investment provision permits foreign insurance companies to reduce, but never to eliminate, the discrimination inherent in the domestic preference tax statute.

## II

Appellants, a group of insurance companies incorporated outside of the State of Alabama, filed claims with the Alabama Department of Insurance in 1981, contending that the domestic preference tax statute, as applied to them, violated the Equal Protection Clause. They sought refunds of taxes paid for the tax years 1977 through 1980. The Commissioner of Insurance denied all of their claims on July 8, 1981.

---

(1975), and for wet marine and transportation insurance, the rate is three-quarters of one percent for both foreign and domestic insurance companies, § 27–4–6(a).

Appellants appealed to the Circuit Court for Montgomery County, seeking a judgment declaring the statute to be unconstitutional and requiring the Commissioner to make the appropriate refunds. Several domestic companies intervened, and the court consolidated all of the appeals, selecting two claims as lead cases[4] to be tried and binding on all claimants. On cross-motions for summary judgment, the court ruled on May 17, 1982, that the statute was constitutional. Relying on this Court's opinion in *Western & Southern Life Ins. Co.* v. *State Board of Equalization of California,* 451 U. S. 648 (1981), the court ruled that the Alabama statute did not violate the Equal Protection Clause because it served "at least two purposes, in addition to raising revenue: (1) encouraging the formation of new insurance companies in Alabama, and (2) encouraging capital investment by foreign insurance companies in the Alabama assets and governmental securities set forth in the statute." App. to Juris. Statement 20a–21a. The court also found that the distinction the statute created between foreign and domestic companies was rationally related to those two purposes and that the Alabama Legislature reasonably could have believed that the classification would have promoted those purposes. *Id.,* at 21a.

After their motion for a new trial was denied, appellants appealed to the Court of Civil Appeals. It affirmed the Circuit Court's rulings as to the existence of the two legitimate state purposes, but remanded for an evidentiary hearing on the issue of rational relationship, concluding that summary judgment was inappropriate on that question because the evidence was in conflict. 437 So. 2d 535 (1983). Appellants petitioned the Supreme Court of Alabama for certiorari on the affirmance of the legitimate state purpose issue, and the State and the intervenors petitioned for review of

---

[4] Metropolitan Life Insurance Co., a New York corporation, was chosen to represent the life insurance claimants, and Prudential Property and Casualty Co., a New Jersey corporation, was chosen as representative of the nonlife claimants. See App. 314–315.

the remand order. Appellants then waived their right to an evidentiary hearing on the issue whether the statute's classification bore a rational relationship to the two purposes found by the Circuit Court to be legitimate, and they requested a final determination of the legal issues with respect to their equal protection challenge to the statute. The Supreme Court denied certiorari on all claims. Appellants again waived their rights to an evidentiary hearing on the rational relationship issue and filed a joint motion with the other parties seeking rehearing and entry of a final judgment. The motion was granted, and judgment was entered for the State and the intervenors. 447 So. 2d 142 (1983). This appeal followed, and we noted probable jurisdiction. 466 U. S. 935 (1984). We now reverse.

## III

Prior to our decision in *Western & Southern Life Ins. Co.* v. *State Board of Equalization of California, supra,* the jurisprudence of the applicability of the Equal Protection Clause to discriminatory tax statutes had a somewhat checkered history. *Lincoln National Life Ins. Co.* v. *Read,* 325 U. S. 673 (1945), held that so-called "privilege" taxes, required to be paid by a foreign corporation before it would be permitted to do business within a State, were immune from equal protection challenge. That case stood in stark contrast, however, to the Court's prior decisions in *Southern R. Co.* v. *Greene,* 216 U. S. 400 (1910), and *Hanover Fire Ins. Co.* v. *Harding,* 272 U. S. 494 (1926), as well as to later decisions, in which the Court had recognized that the Equal Protection Clause placed limits on other forms of discriminatory taxation imposed on out-of-state corporations solely because of their residence. See, *e. g., WHYY, Inc.* v. *Glassboro,* 393 U. S. 117 (1968); *Allied Stores of Ohio, Inc.* v. *Bowers,* 358 U. S. 522 (1959); *Wheeling Steel Corp.* v. *Glander,* 337 U. S. 562 (1949).

In *Western & Southern, supra,* we reviewed all of these cases for the purpose of deciding whether to permit an equal

protection challenge to a California statute imposing a retaliatory tax on foreign insurance companies doing business within the State, when the home States of those companies imposed a similar tax on California insurers entering their borders. We concluded that *Lincoln* was no more than "a surprising throwback" to the days before enactment of the Fourteenth Amendment and in which incorporation of a domestic corporation or entry of a foreign one had been granted only as a matter of privilege by the State in its unfettered discretion. 451 U. S., at 665. We therefore rejected the longstanding but "anachronis[tic]" rule of *Lincoln* and explicitly held that the Equal Protection Clause imposes limits upon a State's power to condition the right of a foreign corporation to do business within its borders. 451 U. S., at 667. We held that "[w]e consider it now established that, whatever the extent of a State's authority to exclude foreign corporations from doing business within its boundaries, that authority does not justify imposition of more onerous taxes or other burdens on foreign corporations than those imposed on domestic corporations, unless the discrimination between foreign and domestic corporations bears a rational relation to a legitimate state purpose." *Id.*, at 667–668.

Because appellants waived their right to an evidentiary hearing on the issue whether the classification in the Alabama domestic preference tax statute bears a rational relation to the two purposes upheld by the Circuit Court, the only question before us is whether those purposes are legitimate.[5]

---

[5] The State and the intervenors advanced some 15 additional purposes in support of the Alabama statute. As neither the Circuit Court nor the Court of Civil Appeals ruled on the legitimacy of those purposes, that question is not before us, and we express no view as to it. On remand, the State will be free to advance again its arguments relating to the legitimacy of those purposes.

As the dissent finds our failure to resolve whether Alabama may continue to collect its tax "baffling," *post*, at 887, we reemphasize the procedural posture of the case: it arose on a motion for summary judgment. The

## A

### (1)

The first of the purposes found by the trial court to be a legitimate reason for the statute's classification between foreign and domestic corporations is that it encourages the formation of new domestic insurance companies in Alabama. The State, agreeing with the Court of Civil Appeals, contends that this Court has long held that the promotion of domestic industry, in and of itself, is a legitimate state purpose that will survive equal protection scrutiny. In so contending, it relies on a series of cases, including *Western & Southern*, that are said to have upheld discriminatory taxes. See *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263 (1984); *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137 (1970); *Allied Stores of Ohio, Inc.* v. *Bowers, supra; Parker* v. *Brown,* 317 U. S. 341 (1943); *Carmichael* v. *Southern Coal & Coke Co.*, 301 U. S. 495 (1937); *Board of Education* v. *Illinois,* 203 U. S. 553 (1906).

The cases cited lend little or no support to the State's contention. In *Western & Southern,* the case principally relied upon, we did not hold as a general rule that promotion of domestic industry is a legitimate state purpose under equal protection analysis.[6] Rather, we held that California's pur-

_____

Court of Civil Appeals upheld the Circuit Court's ruling that the two purposes identified by it were legitimate, but the appellate court remanded on the issue of rational relationship as to those purposes because it found the evidence in conflict. In order to obtain an expedited ruling, appellants waived their right to an evidentiary hearing only as to the purposes "which the lower courts have determined to be legitimate." 447 So. 2d 142, 143 (Ala. 1983). Thus, for this Court to resolve whether Alabama may continue to collect the tax, it would have to decide *de novo* whether any of the other purposes was legitimate, and also whether the statute's classification bore a rational relationship to any of these purposes—all this, on a record that the Court of Civil Appeals deemed inadequate.

[6] We find the other cases on which the State relies also to be inapposite. to this inquiry. *Bacchus Imports, Pike,* and *Parker* discussed whether

pose in enacting the retaliatory tax—to promote the *interstate* business of domestic insurers by deterring *other States* from enacting discriminatory or excessive taxes—was a legitimate one. 451 U. S., at 668. In contrast, Alabama asks us to approve its purpose of promoting the business of its domestic insurers *in Alabama* by penalizing foreign insurers who also want to do business in the State. Alabama has made no attempt, as California did, to influence the policies of

---

promotion of local industry is a valid state purpose under the Commerce Clause. The Commerce Clause, unlike the Equal Protection Clause, is integrally concerned with whether a state purpose implicates local or national interests. The Equal Protection Clause, in contrast, is concerned with whether a state purpose is impermissibly discriminatory; whether the discrimination involves local or other interests is not central to the inquiry to be made. Thus, the fact that promotion of local industry is a legitimate state interest in the Commerce Clause context says nothing about its validity under equal protection analysis. See *infra*, at 880–881.

Moreover, neither *Bacchus* nor *Pike* ruled that a State's ability to promote domestic industry was unlimited, even under the Commerce Clause. Thus, in *Bacchus*, although we observed as a general matter that "a State may enact laws pursuant to its police powers that have the purpose and effect of encouraging domestic industry," 468 U. S., at 271, we held that in so doing, a State may not constitutionally impose a discriminatory burden upon the business of other States, merely to protect and promote local business, *id.*, at 272–273. Accord, *Armco Inc.* v. *Hardesty*, 467 U. S. 638, 642 (1984). Likewise, in *Pike*, the Court held that the state statute promoting a legitimate local interest must "regulat[e] evenhandedly." 397 U. S., at 142.

Other cases cited by the State are simply irrelevant to the legitimacy of promoting local business at all. *Carmichael* relates primarily to the validity of a state unemployment compensation scheme, and *Board of Education* deals with the State's ability to regulate matters relating to probate. *Bowers* is the only one of the State's cases that involves the validity under the Equal Protection Clause of a tax that discriminates on the basis of residence of domestic *versus* foreign corporations. That case does little, however, to support the State's contention that promotion of domestic business is a legitimate state purpose. It was concerned with encouraging nonresidents—who are not competitors of residents—to build warehouses within the State. See *infra*, at 879–880.

other States in order to enhance its domestic companies' ability to operate interstate; rather, it has erected barriers to foreign companies who wish to do interstate business in order to improve its domestic insurers' ability to compete at home.

The crucial distinction between the two cases lies in the fact that Alabama's aim to promote domestic industry is purely and completely discriminatory, designed only to favor domestic industry within the State, no matter what the cost to foreign corporations also seeking to do business there. Alabama's purpose, contrary to California's, constitutes the very sort of parochial discrimination that the Equal Protection Clause was intended to prevent. As JUSTICE BRENNAN, joined by Justice Harlan, observed in his concurrence in *Allied Stores of Ohio, Inc.* v. *Bowers,* 358 U. S. 522 (1959), this Court always has held that the Equal Protection Clause forbids a State to discriminate in favor of its own residents solely by burdening "the residents of other state members of our federation." *Id.,* at 533. Unlike the retaliatory tax involved in *Western & Southern,* which only burdens residents of a State that imposes its own discriminatory tax on outsiders, the domestic preference tax gives the "home team" an advantage by burdening *all* foreign corporations seeking to do business within the State, no matter what they or their States do.

The validity of the view that a State may not constitutionally favor its own residents by taxing foreign corporations at a higher rate solely because of their residence is confirmed by a long line of this Court's cases so holding. *WHYY, Inc.* v. *Glassboro,* 393 U. S., at 119–120; *Wheeling Steel Corp.* v. *Glander,* 337 U. S., at 571; *Hanover Fire Ins. Co.* v. *Harding,* 272 U. S., at 511; *Southern R. Co.* v. *Greene,* 216 U. S., at 417. See *Reserve Life Ins. Co.* v. *Bowers,* 380 U. S. 258 (1965) *(per curiam).* As the Court stated in *Hanover Fire Ins. Co.,* with respect to general tax burdens on business, "the foreign corporation stands equal, and is to be classified with domestic corporations of the same kind."

272 U. S., at 511. In all of these cases, the discriminatory tax was imposed by the State on foreign corporations doing business within the State solely because of their residence, presumably to promote domestic industry within the State.[7] In relying on these cases and rejecting *Lincoln* in *Western & Southern*, we reaffirmed the continuing viability of the Equal Protection Clause as a means of challenging a statute that seeks to benefit domestic industry within the State only by grossly discriminating against foreign competitors.

The State contends that *Allied Stores of Ohio, Inc.* v. *Bowers, supra,* shows that this principle has not always held true. In that case, a domestic merchandiser challenged on equal protection grounds an Ohio statute that exempted foreign corporations from a tax on the value of merchandise held for storage within the State. The Court upheld the tax, finding that the purpose of encouraging foreign companies to build warehouses within Ohio was a legitimate state purpose. The State contends that this case shows that promotion of domestic business *is* a legitimate state purpose under equal protection analysis.

We disagree with the State's interpretation of *Allied Stores* and find that the case is not inconsistent with the other cases on which we rely. We agree with the holding of *Allied Stores* that a State's goal of bringing in new business is legitimate and often admirable. *Allied Stores* does not, however, hold that promotion of domestic business by *discriminating* against foreign corporations is legitimate. The case involves instead a statute that *encourages nonresidents*— who are not competitors of residents—to build warehouses within the State. The discriminatory tax involved did not favor residents by burdening outsiders; rather, it granted the

---

[7] Although the promotion of domestic business was not a purpose advanced by the States in support of their taxes in these cases, such promotion is logically the primary reason for enacting discriminatory taxes such as those at issue there.

nonresident businesses an exemption that residents did not share. Since the foreign and domestic companies involved were not competing to provide warehousing services, granting the former an exemption did not even directly affect adversely the domestic companies subject to the tax. On its facts, then, *Allied Stores* is not inconsistent with our holding here that promotion of domestic business within a State, by discriminating against foreign corporations that wish to compete by doing business there, is not a legitimate state purpose. See 358 U. S., at 532–533 (BRENNAN, J., concurring).

(2)

The State argues nonetheless that it is impermissible to view a discriminatory tax such as the one at issue here as violative of the Equal Protection Clause. This approach, it contends, amounts to no more than "Commerce Clause rhetoric in equal protection clothing." Brief for Appellee Ward 22. The State maintains that because Congress, in enacting the McCarran-Ferguson Act, 15 U. S. C. §§ 1011–1015, intended to authorize States to impose taxes that burden interstate commerce in the insurance field, the tax at issue here must stand. Our concerns are much more fundamental than as characterized by the State. Although the McCarran-Ferguson Act exempts the insurance industry from Commerce Clause restrictions, it does not purport to limit in any way the applicability of the Equal Protection Clause. As noted above, our opinion in *Western & Southern* expressly reaffirmed the viability of equal protection restraints on discriminatory taxes in the insurance context.[8]

---

[8] In fact, as we noted in *Western & Southern*, the legislative history of the McCarran-Ferguson Act reveals that the Act was Congress' response only to *United States* v. *South-Eastern Underwriters Assn.*, 322 U. S. 533 (1944), and that Congress did not intend thereby to give the States any power to tax or regulate the insurance industry other than what they had previously possessed. Thus Congress expressly left undisturbed this Court's decisions holding that the Equal Protection Clause places

Moreover, the State's view ignores the differences between Commerce Clause and equal protection analysis and the consequent different purposes those two constitutional provisions serve. Under Commerce Clause analysis, the State's interest, if legitimate, is weighed against the burden the state law would impose on interstate commerce. In the equal protection context, however, if the State's purpose is found to be legitimate, the state law stands as long as the burden it imposes is found to be rationally related to that purpose, a relationship that is not difficult to establish. See *Western & Southern*, 451 U. S., at 674 (if purpose is legitimate, equal protection challenge may not prevail so long as the question of rational relationship is "'at least debatable'" (quoting *United States* v. *Carolene Products Co.*, 304 U. S. 144, 154 (1938)).

The two constitutional provisions perform different functions in the analysis of the permissible scope of a State's power—one protects interstate commerce, and the other protects persons[9] from unconstitutional discrimination by the States. See *Bethlehem Motors Corp.* v. *Flynt*, 256 U. S. 421, 423–424 (1921). The effect of the statute at issue here is to place a discriminatory tax burden on foreign insurers who desire to do business within the State, thereby also incidentally placing a burden on interstate commerce. Equal protection restraints are applicable even though the *effect* of the discrimination in this case is similar to the type of burden with which the Commerce Clause also would be concerned. We reaffirmed the importance of the Equal Protection Clause in the insurance context in *Western & Southern* and see no reason now for reassessing that view.

---

limits on a State's ability to tax out-of-state corporations. See 451 U. S., at 655, n. 6.

[9] It is well established that a corporation is a "person" within the meaning of the Fourteenth Amendment. *E. g.*, *Western & Southern*, 451 U. S., at 660, n. 12.

In whatever light the State's position is cast, acceptance of its contention that promotion of domestic industry is always a legitimate state purpose under equal protection analysis would eviscerate the Equal Protection Clause in this context. A State's natural inclination frequently would be to prefer domestic business over foreign. If we accept the State's view here, then any discriminatory tax would be valid if the State could show it reasonably was intended to benefit domestic business.[10] A discriminatory tax would stand or fall depending primarily on how a State framed its purpose— as benefiting one group or as harming another. This is a distinction without a difference, and one that we rejected last Term in an analogous context arising under the Commerce Clause. *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S., at 273. See n. 6, *supra.* We hold that under the circumstances of this case, promotion of domestic business by discriminating against nonresident competitors is not a legitimate state purpose.

## B

The second purpose found by the courts below to be legitimate was the encouragement of capital investment in the Alabama assets and governmental securities specified in the statute. We do not agree that this is a legitimate state purpose when furthered by discrimination. Domestic insurers remain entitled to the more favorable rate of tax regardless of whether they invest in Alabama assets. Moreover, the investment incentive provision of the Alabama statute does not enable foreign insurance companies to eliminate the discriminatory effect of the statute. No matter how much of

---

[10] Indeed, under the State's analysis, *any* discrimination subject to the rational relation level of scrutiny could be justified simply on the ground that it favored one group at the expense of another. This case does not involve or question, as the dissent suggests, *post*, at 900–901, the broad authority of a State to promote and regulate its own economy. We hold only that such regulation may not be accomplished by imposing discriminatorily higher taxes on nonresident corporations solely because they are nonresidents.

their assets they invest in Alabama, foreign insurance companies are still required to pay a higher gross premiums tax than domestic companies. The State's investment incentive provision therefore does not cure, but reaffirms, the statute's impermissible classification based solely on residence. We hold that encouraging investment in Alabama assets and securities in this plainly discriminatory manner serves no legitimate state purpose.

## IV

We conclude that neither of the two purposes furthered by the Alabama domestic preference tax statute and addressed by the Circuit Court for Montgomery County, see *supra*, at 873, is legitimate under the Equal Protection Clause to justify the imposition of the discriminatory tax at issue here. The judgment of the Alabama Supreme Court accordingly is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE REHNQUIST join, dissenting.

This case presents a simple question: Is it legitimate for a State to use its taxing power to promote a domestic insurance industry and to encourage capital investment within its borders? In a holding that can only be characterized as astonishing, the Court determines that these purposes are illegitimate. This holding is unsupported by precedent and subtly distorts the constitutional balance, threatening the freedom of both state and federal legislative bodies to fashion appropriate classifications in economic legislation. Because I disagree with both the Court's method of analysis and its conclusion, I respectfully dissent.

## I

Alabama's legislature has chosen to impose a higher tax on out-of-state insurance companies and insurance companies incorporated in Alabama that do not maintain their principal

place of business or invest assets within the State. Ala. Code § 27–4–4 *et seq.* (1975). This tax seeks to promote both a domestic insurance industry and capital investment in Alabama. App. to Juris. Statement 20a–21a. Metropolitan Life Insurance Company, joined by many other out-of-state insurers, alleges that this discrimination violates its rights under the Equal Protection Clause of the Fourteenth Amendment, which provides that a State shall not "deny to any person within its jurisdiction the equal protection of the laws." Appellants rely on the Equal Protection Clause because, as corporations, they are not "citizens" protected by the Privileges and Immunities Clauses of the Constitution. *Hemphill* v. *Orloff*, 277 U. S. 537, 548–550 (1928). Similarly, they cannot claim Commerce Clause protection because Congress in the McCarran-Ferguson Act, 59 Stat. 33, as amended, 15 U. S. C. § 1011 *et seq.*, explicitly suspended Commerce Clause restraints on state taxation of insurance and placed insurance regulation firmly within the purview of the several States. *Western & Southern Life Ins. Co.* v. *State Board of Equalization of California*, 451 U. S. 648, 655 (1981).

Our precedents impose a heavy burden on those who challenge local economic regulation solely on Equal Protection Clause grounds. In this context, our long-established jurisprudence requires us to defer to a legislature's judgment if the classification is rationally related to a legitimate state purpose. Yet the Court evades this careful framework for analysis, melding the proper two-step inquiry regarding the State's purpose and the classification's relationship to that purpose into a single unarticulated judgment. This tactic enables the Court to characterize state goals that have been legitimated by Congress itself as improper solely because it disagrees with the concededly rational means of differential taxation selected by the legislature. This unorthodox approach leads to further error. The Court gives only the most cursory attention to the factual and legal bases supporting the State's purposes and ignores both precedent

and significant evidence in the record establishing their legitimacy. Most troubling, the Court discovers in the Equal Protection Clause an implied prohibition against classifications whose purpose is to give the "home team" an advantage over interstate competitors even where Congress has authorized such advantages. *Ante*, at 878.

The Court overlooks the unequivocal language of our prior decisions. "Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest." *New Orleans* v. *Dukes*, 427 U. S. 297, 303 (1976). See, *e. g.*, *Lehnhausen* v. *Lake Shore Auto Parts Co.*, 410 U. S. 356 (1973). Judicial deference is strongest where a tax classification is alleged to infringe the right to equal protection. "[I]n taxation, even more than in other fields, legislatures possess the greatest freedom in classification." *Madden* v. *Kentucky*, 309 U. S. 83, 88 (1940). "Where the public interest is served one business may be left untaxed and another taxed, in order to promote the one or to restrict or suppress the other." *Carmichael* v. *Southern Coal & Coke Co.*, 301 U. S. 495, 512 (1937) (citations omitted). As the Court emphatically noted in *Allied Stores of Ohio, Inc.* v. *Bowers*, 358 U. S. 522, 528 (1959) (citations omitted):

> "[I]t has repeatedly been held and appears to be entirely settled that a statute which encourages the location within the State of needed and useful industries by exempting them, though not also others, from its taxes is not arbitrary and does not violate the Equal Protection Clause of the Fourteenth Amendment. Similarly, it has long been settled that a classification, though discriminatory, is not arbitrary or violative of the Equal Protection Clause of the Fourteenth Amendment if any

state of facts reasonably can be conceived that would sustain it."

See also *Western & Southern Life Ins. Co.* v. *State Board of Equalization of California, supra,* at 674; *Minnesota* v. *Clover Leaf Creamery Co.,* 449 U. S. 456, 464 (1981).

Appellants waived their right to an evidentiary hearing and conceded that Alabama's classification was rationally related to its purposes of encouraging the formation of domestic insurance companies and bringing needed services and capital to the State. Thus the only issue in dispute is the legitimacy of these purposes. Yet it is obviously legitimate for a State to seek to promote local business and attract capital investment, and surely those purposes animate a wide range of legislation in all 50 States.

The majority evades the obvious by refusing to acknowledge the factual background bearing on the legitimacy of the State's purpose or to address the many collateral public benefits advanced by Alabama. Instead, the Court dismisses appellees' arguments by merely stating that they were not ruled on by the courts below. *Ante,* at 875–876, n. 5. In point of fact, the full range of purposes documented before this Court was also argued and documented before the Alabama Circuit Court. See Record, Vols. 6–8. That court found "*at least* two purposes, in addition to raising revenue: (1) encouraging the formation of new insurance companies in Alabama, and (2) encouraging capital investment by foreign insurance companies in the Alabama assets and governmental securities set forth in the statute." App. to Juris. Statement 20a–21a (emphasis added). As appellants concede, these purposes are simply a step in achieving the "larger set of purposes [whose] premise . . . is that domestic insurance companies, on the whole, benefit the state in ways which foreign companies do not." Brief for Appellants 31.

In any event, it is settled law that the appellee may assert any argument in support of the judgment in his favor, regardless of whether it was relied upon by the court below.

*Dandridge* v. *Williams*, 397 U. S. 471, 475, n. 6 (1970). The Court's failure actually to resolve whether Alabama may continue to collect its tax, see *ante*, at 882, n. 10, is all the more baffling, since appellants took the exceptional step of conceding the factual issues to assure a speedy resolution of numerous pending lawsuits disruptive of industry stability. See Brief for State of Alaska et al. as *Amici Curiae* 1–2. Our precedents do not condone such a miserly approach to review of statutes adjusting economic burdens. See, *e. g.*, *Allied Stores of Ohio, Inc.* v. *Bowers, supra,* at 528–529; *McGowan* v. *Maryland,* 366 U. S. 420, 425 (1961); *United States* v. *Carolene Products Co.,* 304 U. S. 144, 152–153 (1938); *Borden's Farm Products Co.* v. *Baldwin,* 293 U. S. 194, 209 (1934). The Court has consistently reviewed the validity of such statutes based on whatever "may reasonably have been the purpose and policy of the State Legislature, in adopting the proviso." *Allied Stores of Ohio, Inc.* v. *Bowers, supra,* at 528–529. It is to that inquiry that I now turn.

Appellees claim that Alabama's insurance tax, in addition to raising revenue and promoting investment, promotes the formation of new domestic insurance companies and enables them to compete with the many large multistate insurers that currently occupy some 75% to 85% of the Alabama insurance market. App. 80. Economic studies submitted by the State document differences between the two classes of insurers that are directly relevant to the well-being of Alabama's citizens. See *id.,* at 46–129. Foreign insurers typically concentrate on affluent, high volume, urban markets and offer standardized national policies. In contrast, domestic insurers such as intervenors American Educators Life Insurance Company and Booker T. Washington Life Insurance Company are more likely to serve Alabama's rural areas, and to write low-cost industrial and burial policies not offered by the larger national companies.[1] Additionally, appellees argue

---

[1] "Industrial insurance" is the trade term for a low face-value policy typically sold door-to-door and maintained through home collection of monthly

persuasively that Alabama can more readily regulate domestic insurers and more effectively safeguard their solvency than that of insurers domiciled and having their principal places of business in other States.

Ignoring these policy considerations, the Court insists that Alabama seeks only to benefit local business, a purpose the Court labels invidious. Yet if the classification chosen by the State can be shown *actually* to promote the public welfare, this is strong evidence of a legitimate state purpose. See Note, Taxing Out-of-State Corporations After *Western & Southern:* An Equal Protection Analysis, 34 Stan. L. Rev. 877, 896 (1982). In this regard, Justice Frankfurter wisely observed:

"[T]he great divide in the [equal protection] decisions lies in the difference between emphasizing the actualities or the abstractions of legislation.

". . . To recognize marked differences that exist in fact is living law; to disregard practical differences and concentrate on some abstract identities is lifeless logic." *Morey* v. *Doud*, 354 U. S. 457, 472 (1957) (dissenting).

A thoughtful look at the "actualities of [this] legislation" compels the conclusion that the State's goals are legitimate by any test.

## II

The policy of favoring local concerns in state regulation and taxation of insurance, which the majority condemns as illegitimate, is not merely a recent invention of the States. The States initiated regulation of the business of insurance as early as 1851. See Report of the Comptroller General,

---

or weekly premiums. Alabama currently has more industrial insurance in force than any other State. Burial insurance is another form of insurance popular in rural Alabama that is offered exclusively by local insurers. By contrast, Metropolitan Life, like many multistate insurers, has discontinued writing even whole-life policies with face values below $15,000. App. 173–176.

Issues and Needed Improvements in State Regulation of the Insurance Business, GAO Report B–192813, p. 5 (Oct. 9, 1979) (GAO Report). In 1944, however, this Court overruled a long line of cases holding that the business of insurance was an intrastate activity beyond the scope of the Commerce Clause. *United States* v. *South-Eastern Underwriters Assn.*, 322 U. S. 533. "The decision provoked widespread concern that the States would no longer be able to engage in taxation and effective regulation of the insurance industry. Congress moved quickly, enacting the McCarran-Ferguson Act within a year of the decision in *South-Eastern Underwriters*." *St. Paul Fire & Marine Insurance Co.* v. *Barry*, 438 U. S. 531, 539 (1978). See H. R. Rep. No. 143, 79th Cong., 1st Sess., 2 (1945); 91 Cong. Rec. 479–480 (1945) (remarks of Sen. Ferguson); *id.*, at 487 (remarks of Sen. Ellender).

The drafters of the Act were sensitive to the same concerns Alabama now vainly seeks to bring to this Court's attention: the greater responsiveness of local insurance companies to local conditions, the different insurance needs of rural and industrial States, the special advantages and constraints of state-by-state regulation, and the importance of insurance license fees and taxes as a major source of state revenues. See, *e. g.*, Hearings on S. 1362 before the Senate Subcommittee on the Judiciary, 78th Cong., 1st Sess., 3, 10, 16–17 (1943) (letter of Gov. Sharpe of South Dakota stressing role of domestic insurers that provide "poor man" and rural policies adapted to farming concerns); 90 Cong. Rec. 6564 (1944) (remarks of Rep. Vorhis). "As this Court observed shortly afterward, '[o]bviously Congress' purpose was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance.' *Prudential Insurance Co.* v. *Benjamin*, 328 U. S. 408, 429 (1946)." *St. Paul Fire & Marine Insurance Co.* v. *Barry, supra*, at 539.

The majority opinion correctly notes that Congress did not intend the McCarran-Ferguson Act to give the States

any power to tax or regulate the insurance industry other than they already possessed. But the legislative history cited by the majority, *ante*, at 879, n. 7, relates not to differential taxation but to decisions of this Court that had invalidated state taxes on contracts of insurance entered into outside the State's jurisdiction. See H. R. Rep. No. 143, 79th Cong., 1st Sess., 3 (1945). The Court fails to mention that at the time the Act was under consideration the taxing schemes of Alabama, Arizona, Arkansas, Illinois, Kansas, Kentucky, Maine, Michigan, Mississippi, Ohio, Oklahoma, Oregon, South Dakota, Tennessee, Texas, Washington, and Wisconsin all incorporated tax differentials favoring domestic insurers. See App. 377–379.

Any doubt that Congress' intent encompassed taxes that discriminate in favor of local insurers was dispelled in *Prudential Insurance Co.* v. *Benjamin*, 328 U. S. 408 (1946). Cf. Note, Congressional Consent to Discriminatory State Legislation, 45 Colum. L. Rev. 927 (1945) (discussing the issues of constitutional power posed by the Act). There a foreign insurer challenged a tax on annual gross premiums imposed on foreign but not domestic insurers as a condition for renewal of its license to do business. Congress, the foreign insurer argued, was powerless to sanction the tax at issue because "the commerce clause 'by its own force' forbids discriminatory state taxation." 328 U. S., at 426. A unanimous Court rejected the argument that exacting a 3% gross premium tax from foreign insurers was invalid as "somehow technically of an inherently discriminatory character." *Id.*, at 432. The Court concluded that the McCarran-Ferguson Act's effect was "clearly to sustain the exaction and that this can be done without violating *any* constitutional provision." *Id.*, at 427 (emphasis added).

*Benjamin* expressly noted that nothing in the Equal Protection Clause forbade the State to enact a law such as the tax at issue. *Id.*, at 438, and n. 50. In this regard the Court relied in part on *Hanover Fire Ins. Co.* v. *Harding*,

272 U. S. 494 (1926), a decision that explicitly recognized that differential taxation of revenues of foreign corporations may not be arbitrary or without reasonable basis. See *Western & Southern Life Ins. Co.* v. *State Board of Equalization of California,* 451 U. S., at 664, n. 17. The Commerce Clause, *Benjamin* emphasized, is not a "one-way street" but encompasses congressional power "to discriminate against interstate commerce and in favor of local trade," "subject only to the restrictions placed upon its authority by other constitutional provisions." 328 U. S., at 434. Where the States and Congress have acted in concert to effect a policy favoring local concerns, their action must be upheld unless it unequivocally exceeds "some explicit and compelling limitation imposed by a constitutional provision or provisions designed and intended to outlaw the action taken entirely from our constitutional framework." *Id.,* at 435–436.

Our more recent decision in *Western & Southern* in no way undermines the force of the analysis in *Benjamin.* *Western & Southern* confirms that differential premium taxes are not immune from review as "privilege" taxes, but it also teaches that the Constitution requires only that discrimination between domestic and foreign corporations bear a rational relationship to a legitimate state purpose. *Benjamin* clearly recognized that differentially taxing foreign insurers to promote a local insurance industry was a legitimate state purpose completely consonant with Congress' purpose in the McCarran-Ferguson Act.

The contemporary realities of insurance regulation and taxation continue to justify a uniquely local perspective. Insurance regulation and taxation must serve local social policies including assuring the solvency and reliability of companies doing business in the State and providing special protection for those who might be denied insurance in a free market, such as the urban poor, small businesses, and family farms. GAO Report 10–13; State Insurance Regulation, Hearing before the Subcommittee on Antitrust, Monopoly

and Business Rights of the Senate Committee on the Judiciary, 96th Cong., 1st Sess., 19–21 (1979) (hereinafter Insurance Regulation). Currently at least 28 of the 50 States employ a combination of investment incentives and differential premium taxes favoring domestic insurers to encourage local investment of policyholders' premiums and to partially shelter smaller domestic insurers from competition with the large multistate companies. App. 66.

State insurance commissions vary widely in manpower and expertise. GAO Report 14. In practice, the State of incorporation exercises primary oversight of the solvency of its insurers. *Id.*, at 36–38. See generally Dunne, Risk, Reality, and Reason in Financial Services Deregulation: A State Legislative Perspective, 2 J. Ins. Reg. 342 (1984) (prepared by the Conference of Insurance Legislators). See, *e. g.*, Ala. Code § 27–2–21 (Supp. 1984); Ill. Rev. Stat., ch. 73, ¶ 745 (1983) (power to examine books of domestic insurers); Ala. Code § 27–32–1 *et seq.* (1975); Ill. Rev. Stat., ch. 73, ¶¶ 799, 800 (1983) (commissioner's authority to assume control to prevent insolvency); see generally Wis. Stat. Ann., ch. 620, Prefatory Committee Comment—1971, pp. 536, 546 (1980) (noting lesser control over nondomestic's financial operations). Even the State of incorporation's efforts to regulate a multistate insurer may be seriously hampered by the difficulty of gaining access to records and assets in 49 other States. Dunne, *supra*, at 356. Thus the security of Alabama's citizens who purchase insurance from out-of-state companies may depend in part on the diligence of another State's insurance commissioner, over whom Alabama has no authority and limited influence. In the event of financial failure of a foreign insurer the State may have difficulty levying on out-of-state assets. See, *e. g.*, *South Carolina ex rel. Phoenix Life Ins. Co. v. McMaster*, 237 U. S. 63, 73 (1915). Since each State maintains its own insurance guarantee fund, the domestic insurers of the States where a multistate insurer is admitted to do business may ultimately

be forced to absorb local policyholders' losses. Dunne, *supra*, at 372–373.

Many have sharply criticized this piecemeal system, see, *e. g.*, GAO Report i–iii; Schmalz, The Insurance Exemption: Can it be Modified Successfully?, 48 ABA Antitrust L. J. 579 (1979), but Congress has resisted suggestions that it modify the McCarran-Ferguson Act to permit greater federal intervention. See GAO Report 1; Insurance Regulation, *supra.* This Court cannot ignore the exigencies of contemporary insurance regulation outlined above simply because it might prefer uniform federal regulation. Given the distinctions in ease of regulation and services rendered by foreign and domestic insurers, we cannot dismiss as illegitimate the State's goal of promoting a healthy local insurance industry sensitive to regional differences and composed of companies that agree to subordinate themselves to the Alabama Commissioner's control and to maintain a principal place of business within Alabama's borders. Though economists might dispute the efficacy of Alabama's tax, "[p]arties challenging legislation under the Equal Protection Clause cannot prevail so long as 'it is evident from all the considerations presented to [the legislature], and those of which we may take judicial notice, that the question is at least debatable.'" *Western & Southern Life Ins. Co.* v. *State Board of Equalization of California,* 451 U. S., at 674, quoting *United States* v. *Carolene Products Co.,* 304 U. S., at 154. Moreover, appellants waived their right to challenge the tax measure's effectiveness.

## III

Despite abundant evidence of a legitimate state purpose, the majority condemns Alabama's tax as "purely and completely discriminatory" and "the very sort of parochial discrimination that the Equal Protection Clause was intended to prevent." *Ante,* at 878. Apparently, the majority views any favoritism of domestic commercial entities as inherently

suspect. The majority ignores a long line of our decisions. In the past this Court has not hesitated to apply the rational basis test to regulatory classifications that distinguish between domestic and out-of-state corporations or burden foreign interests to protect local concerns. The Court has always recognized that there are certain legitimate restrictions or policies in which, "[b]y definition, discrimination against nonresidents would inhere." *Arlington County Board* v. *Richards*, 434 U. S. 5, 7 (1977) *(per curiam)*. For example, where State of incorporation or principal place of business affect the State's ability to regulate or exercise its jurisdiction, a State may validly discriminate between foreign and domestic entities. See *G. D. Searle & Co.* v. *Cohn*, 455 U. S. 404 (1982) (difficulty of obtaining jurisdiction over nonresident corporation provides a rational basis for excepting such corporations from statute of limitations); *Metropolitan Casualty Ins. Co.* v. *Brownell*, 294 U. S. 580 (1935) (domicile of insurer relevant to statute of limitations as foreign insurers' offices and funds generally located outside State); *Board of Education* v. *Illinois*, 203 U. S. 553, 562 (1906) (State's greater control over domestic than foreign nonprofit corporations justifies discriminatory tax).

A State may use its taxing power to entice useful foreign industry, see *Allied Stores of Ohio, Inc.* v. *Bowers*, 358 U. S., at 528, or to make residence within its boundaries more attractive, see *Zobel* v. *Williams*, 457 U. S. 55 , 67–68 (1982) (BRENNAN, J., concurring). Though such measures might run afoul of the Commerce Clause, "[n]o one disputes that a State may enact laws pursuant to its police powers that have the purpose and effect of encouraging domestic industry." *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263, 271 (1984); *Western & Southern Life Ins. Co.* v. *State Board of Equalization of California, supra*, at 668. Cf. *Edgar* v. *MITE Corp.*, 457 U. S. 624, 646 (1982) (POWELL, J., concurring in part) (noting State's interest in protecting regionally based corporations from acquisition by foreign corporations).

Moreover, the Court has held in the dormant Commerce Clause context that a State may provide subsidies or rebates to domestic but not to foreign enterprises if it rationally believes that the former contribute to the State's welfare in ways that the latter do not. *Hughes* v. *Alexandria Scrap Corp.*, 426 U. S. 794 (1976). Although the Court has divided on the circumstances in which the dormant Commerce Clause allows such measures, see *id.*, at 817 (BRENNAN, J., dissenting), surely there can be no dispute that they are constitutionally permitted where Congress itself has affirmatively authorized the States to promote local business concerns free of Commerce Clause constraints. Neither the Commerce Clause nor the Equal Protection Clause bars Congress from enacting or authorizing the States to enact legislation to protect industry in one State "from disadvantageous competition" with less stringently regulated businesses in other States. *Hodel* v. *Indiana*, 452 U. S. 314, 329 (1981). See also *Western & Southern, supra,* at 669 (with congressional approval, States may promote domestic insurers by seeking to deter other States from enacting discriminatory or excessive taxes).

The majority's attempts to distinguish these precedents are unconvincing. First the majority suggests that a state purpose might be legitimate for purposes of the Commerce Clause but somehow illegitimate for purposes of the Equal Protection Clause. No basis is advanced for this theory because no basis exists. The test of a legitimate state purpose must be whether it addresses valid state concerns. To suggest that the purpose's legitimacy, chameleon-like, changes according to the constitutional clause cited in the complaint is merely another pretext to escape the clear message of this Court's precedents.

Next the majority asserts that "a State may not constitutionally favor its own residents by taxing foreign corporations at a higher rate solely because of their residence," citing cases that rejected discriminatory ad valorem property taxes,

defended as taxes on the "privilege" of doing business. *Ante,* at 878–879. See, *e. g., WHYY, Inc.* v. *Glassboro,* 393 U. S. 117 (1968); *Wheeling Steel Corp.* v. *Glander,* 337 U. S. 562 (1949); *Hanover Fire Ins. Co.* v. *Harding,* 272 U. S. 494 (1926); *Southern R. Co.* v. *Greene,* 216 U. S. 400 (1910). These decisions were addressed in *Western & Southern,* and the classifications were characterized as impermissibly discriminatory because they did not " 'rest on differences pertinent to the subject in respect of which the classification is made.'" 451 U. S., at 668, quoting *Power Manufacturing Co.* v. *Saunders,* 274 U. S. 490, 494 (1927). As the majority concedes, none of these decisions intimates that the tax statutes at issue in the decisions rested on relevant differences between domestic and foreign corporations or had purposes other than the raising of revenue at the out-of-state corporations' expense.

In fact, the Court noted in several of these opinions that foreign corporations *may* validly be taxed at a higher rate if the classification is based on some relevant distinction. No such distinction, however, had been demonstrated or even alleged. See *WHYY, Inc.* v. *Glassboro, supra,* at 120 ("This is not a case in which the exemption was withheld by reason of the foreign corporation's failure or inability to benefit the State in the same measure as do domestic nonprofit corporations"); *Wheeling Steel Corp.* v. *Glander, supra,* at 572 ("[T]he inequality is not because of the slightest difference in Ohio's relation to the decisive transaction"); *Southern R. Co.* v. *Greene, supra,* at 416–417 (parties conceded that the business of the foreign and domestic corporations was precisely the same).[2] Lacking the threshold requirement of an articu-

---

[2] The only cited authority that arguably addressed the issue raised in the instant case is a *per curiam* reversal and remand without opinion of a decision upholding a discriminatory ad valorem tax on a foreign insurer's fixtures and other tangible property. See *Reserve Life Ins. Co.* v. *Bowers,* 380 U. S. 258 (1965). A reversal and remand is more enigmatic even

lated distinction relevant to an asserted purpose, the classifications at issue in these decisions could never have survived rational basis scrutiny and no such analysis was even attempted. These precedents do not answer the question posed by this case: whether a legislature may adopt differential tax treatment of domestic and foreign insurers not simply to raise additional revenue but with the purpose of affecting the market as an "instrument of economic and social engineering." P. Hartman, Federal Limitations on State and Local Taxation § 3:2 (1981). The majority's suggestion that these cases necessarily decided the issue before us, as promotion of domestic business is "logically the primary reason for enacting discriminatory taxes such as those at issue [in the cited cases]," is mere speculation. See *ante*, at 879, n. 7.

In treating these cases as apposite authority, the majority again closes its eyes to the facts. Alabama does *not* tax at a higher rate solely on the basis of residence; it taxes insurers, domestic as well as foreign, who do not maintain a principal place of business or substantial assets in Alabama, based on conceded distinctions in the contributions of these insurers *as a class* to the State's insurance objectives. The majority obscures the issue by observing that a given "foreign insurance company doing the same type and volume of business in Alabama as a domestic company" will pay a higher tax. *Ante*, at 871–872. Under our precedents, tax classifications need merely "res[t] upon some reasonable consideration of difference or policy." *Allied Stores of Ohio, Inc.* v. *Bowers*,

---

than a summary affirmance, which has precedential value only as to "the precise issues necessarily presented and necessarily decided." *Mandel* v. *Bradley*, 432 U. S. 173, 176 (1977). Decisions without opinion may not be equated with "an opinion by this Court treating the question on the merits." See *Edelman* v. *Jordan*, 415 U. S. 651, 670–671 (1974). "Indeed, upon fuller consideration of an issue under plenary review, the Court has not hesitated to discard a rule which a line of summary affirmances may appear to have established." *Fusari* v. *Steinberg*, 419 U. S. 379, 392 (1975) (BURGER, C. J., concurring).

358 U. S., at 527. Rational basis scrutiny does not require that the classification be mathematically precise or that *every* foreign insurer or *every* domestic company fit to perfection the general profile on which the classification is based. "[T]he Equal Protection Clause does not demand a surveyor's precision" in fashioning classifications. *Hughes* v. *Alexandria Scrap Corp.*, 426 U. S., at 814.

## IV

Because Alabama's classification bears a rational relationship to a legitimate purpose, our precedents demand that it be sustained. The Court avoids this clear directive by a remarkable evasive tactic. It simply declares that the ends of promoting a domestic insurance industry and attracting investments to the State *when accomplished through the means of discriminatory taxation* are not legitimate state purposes. This bold assertion marks a drastic and unfortunate departure from established equal protection doctrine. By collapsing the two prongs of the rational basis test into one, the Court arrives at the ultimate issue—whether the *means* are constitutional—without ever engaging in the deferential inquiry we have adopted as a brake on judicial impeachment of legislative policy choices. In addition to unleashing an undisciplined form of Equal Protection Clause scrutiny, the Court's approach today has serious implications for the authority of Congress under the Commerce Clause. Groping for some basis for this radical departure from equal protection analysis, the Court draws heavily on JUSTICE BRENNAN's concurring opinion in *Allied Stores of Ohio, Inc.* v. *Bowers, supra,* at 530, as support for its argument that "the Equal Protection Clause forbids a State to discriminate in favor of its own residents solely by burdening 'the residents of other state members of our federation.'" *Ante,* at 878, quoting 358 U. S., at 533.

As noted in *Western & Southern,* JUSTICE BRENNAN's interpretation has not been adopted by the Court, "which

has subsequently required no more than a rational basis for discrimination by States against out-of-state interests in the context of equal protection litigation." 451 U. S., at 667, n. 21. More importantly, to the extent the Court today purports to find in the Equal Protection Clause an instrument of federalism, it entirely misses the point of JUSTICE BRENNAN's analysis. JUSTICE BRENNAN reasoned that "[t]he Constitution furnishes the structure for the operation of the States with respect to the National Government and with respect to each other" and that "the Equal Protection Clause, among its other roles, operates to maintain this principle of federalism." 358 U. S., at 532. Favoring local business as an end in itself might be "rational" but would be antithetical to federalism. Accepting *arguendo* this interpretation, we have shown that the measure at issue here does not benefit local business as an end in itself but serves important ulterior goals. Moreover, any federalism component of equal protection is fully vindicated where Congress has explicitly validated a parochial focus. Surely the Equal Protection Clause was not intended to supplant the Commerce Clause, foiling Congress' decision under its commerce powers to "affirmatively permit [some measure of] parochial favoritism" when necessary to a healthy federation. *White* v. *Massachussetts Council of Construction Employers, Inc.*, 460 U. S. 204, 213 (1983). Such a view of the Equal Protection Clause cannot be reconciled with the McCarran-Ferguson Act and our decisions in *Western & Southern* and *Benjamin*.

*Western & Southern* established that a State may validly tax out-of-state corporations at a higher rate if its goal is to promote the ability of its domestic businesses to compete in *interstate* markets. Nevertheless, the Court today concludes that the converse policy is forbidden, striking down legislation whose purpose is to encourage the *intrastate* activities of local business concerns by permitting them to compete effectively on their home turf. In essence, the Court declares: "We will excuse an unequal burden on foreign

insurers if the State's purpose is to foster its domestic insurers' activities in *other* States, but the same unequal burden will be unconstitutional when employed to further a policy that places a higher social value on the domestic insurer's *home State* than interstate activities." This conclusion is not drawn from the Commerce Clause, the textual source of constitutional restrictions on state interference with interstate competition. Reliance on the Commerce Clause would, of course, be unavailing here in view of the McCarran-Ferguson Act. Instead the Court engrafts its own economic values on the Equal Protection Clause. Beyond guarding against arbitrary or irrational discrimination, as interpreted by the Court today this Clause now prohibits the effectuation of economic policies, even where sanctioned by Congress, that elevate local concerns over interstate competition. *Ante*, at 876–878. "But a constitution is not intended to embody a particular economic theory . . . . It is made for people of fundamentally differing views." *Lochner* v. *New York*, 198 U. S. 45, 75–76 (1905) (Holmes, J., dissenting). In the heyday of economic due process, Justice Holmes warned:

> "Courts should be careful not to extend [the express] prohibitions [of the Constitution] beyond their obvious meaning by reading into them conceptions of public policy that the particular Court may happen to entertain." *Tyson & Brother* v. *Banton*, 273 U. S. 418, 445–446 (1927) (Holmes, J., dissenting, joined by Brandeis, J.).

Ignoring the wisdom of this observation, the Court fashions its own brand of economic equal protection. In so doing, it supplants a legislative policy endorsed by both Congress and the individual States that explicitly sanctioned the very parochialism in regulation and taxation of insurance that the Court's decision holds illegitimate. This newly unveiled power of the Equal Protection Clause would come as a surprise to the Congress that passed the McCarran-Ferguson Act and the Court that sustained the Act against constitutional attack. In the McCarran-Ferguson Act, Congress

expressly sanctioned such economic parochialism in the context of state regulation and taxation of insurance.

The doctrine adopted by the majority threatens the freedom not only of the States but also of the Federal Government to formulate economic policy. The dangers in discerning in the Equal Protection Clause a prohibition against barriers to interstate business irrespective of the Commerce Clause should be self-evident. The Commerce Clause is a flexible tool of economic policy that Congress may use as it sees fit, letting it lie dormant or invoking it to limit as well as promote the free flow of commerce. Doctrines of equal protection are constitutional limits that constrain the acts of federal and state legislatures alike. See, *e. g., Califano* v. *Webster*, 430 U. S. 313 (1977); Cohen, Congressional Power to Validate Unconstitutional State Laws: A Forgotten Solution to an Old Enigma, 35 Stan. L. Rev. 387, 400–413 (1983). The Court's analysis casts a shadow over numerous congressional enactments that adopted as federal policy "the type of parochial favoritism" the Court today finds unconstitutional. *White* v. *Massachusetts Council of Construction Employers, Inc., supra,* at 213. Contrary to the reasoning in *Benjamin,* the Court today indicates the Equal Protection Clause stands as an independent barrier if courts should determine that either Congress or a State has ventured the "wrong" direction down what has become, by judicial fiat, the one-way street of the Commerce Clause. Nothing in the Constitution or our past decisions supports forcing such an economic straitjacket on the federal system.

## V

Today's opinion charts an ominous course. I can only hope this unfortunate adventure away from the safety of our precedents will be an isolated episode. I had thought the Court had finally accepted that

"the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy deter-

minations made in areas that neither affect fundamental rights nor proceed along suspect lines; in the local economic sphere, it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment." *New Orleans* v. *Dukes*, 427 U. S., at 303–304 (citations omitted).

Because I believe that the Alabama law at issue here serves legitimate state purposes through concededly rational means, and thus is neither invidious nor arbitrary, I would affirm the court below.  I respectfully dissent.