**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 3 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**

---

UNION PACIFIC RAILROAD
COMPANY and UTAH RAILWAY
COMPANY,

     Plaintiffs-Appellees,

v.

STATE OF UTAH; UTAH STATE
TAX COMMISSION; BEAVER
COUNTY; BOX ELDER COUNTY;
CACHE COUNTY; CARBON
COUNTY; DAVIS COUNTY;
EMERY COUNTY; GRAND
COUNTY; IRON COUNTY; JUAB
COUNTY; MILLARD COUNTY;
MORGAN COUNTY; SALT LAKE
COUNTY; SUMMIT COUNTY;
TOOELE COUNTY; UTAH
COUNTY; WASATCH COUNTY;
WASHINGTON COUNTY; WEBER
COUNTY; MONTE MUNNS; KAREN
JEPPESEN; MARILYN GRAHAM;
MARK ALTOM; JOANNE
BEHLING; GRACE EASTIN;
MERNA MITCHELL; JEAN
BOWLES; MARY DAY; GLORIA
ANDERSON; LARRY
RICHARDSON; GLEN THOMPSON;
VALERIE LEE; LEONARD ELLIS;
KAROLYN KIRKHAM; ALIS RITZ;
NILA DAYTON, county defendants,

     Defendants,

Nos. 97-4197
98-4002

and

W. VAL OVESON; RICHARD B.
MCKEOWN; JOE B. PACHECO, JR.;
PAM HENDRICKSON, ALICE
SHEARER, state defendants,

Defendants-Appellants.

- - - - - - - - - - - - - - - - - - - - - - - -
UNITED STATES OF AMERICA,

Intervener.

Appeal from the United States District Court
for the District of Utah
(D.C. Nos. 97-CV-341-C and 97-CV-419-B)

John C. McCarrey, Assistant Attorney General (Kelly W. Wright, Special
Assistant Attorney General and Michelle Bush, Assistant Attorney General, with
him on the briefs), Salt Lake City, Utah, appearing for Defendants-Appellants.

Robert A. Peterson (Kevin Joseph Simon of Giauque, Crockett, Bendinger &
Peterson with him on the brief), of Giauque, Crockett, Bendinger & Peterson, Salt
Lake City, Utah, appearing for Plaintiffs-Appellees.

Stephanie R. Marcus (Mark B. Stern, Department of Justice, Washington, D.C.,
with her on the brief) of the Department of Justice, Washington, D.C., for
Intervener.

Before **SEYMOUR**, Chief Judge, **BRORBY** and **HENRY**, Circuit Judges.

**SEYMOUR**, Chief Judge.

Union Pacific Railroad Company and Utah Railway Company (the Railroads) brought separate actions for injunctive and declaratory relief against the State of Utah, the Utah State Tax Commission and the Tax Commissioners (State defendants), and various Utah counties and the treasurers of these counties (County defendants) under the Railroad Revitalization and Regulatory Reform Act (4-R Act), 49 U.S.C. § 11501 (1994). The Railroads allege that their property has been assessed substantially in excess of its fair market value for tax purposes while all other commercial and industrial property in the same tax category is assessed at less than fair market value, and that this discriminatory treatment violates section 11501.

The State defendants in both cases moved to dismiss on the basis of Eleventh Amendment immunity. The district court ruled in both actions that section 11501 does not abrogate Eleventh Amendment immunity and granted the motions to dismiss with respect to the State of Utah and the Utah Tax Commission. *See Union Pac. R.R. Co. v. Utah*, 996 F. Supp. 1358, 1362 (D. Utah 1997).[1] The court concluded, however, that the individual members of the Tax Commission are amenable to suit under *Ex parte Young*, 209 U.S. 123 (1908), and

[1] The district court ruling in the Union Pacific Railroad case is published as cited above. The ruling in the Utah Railway case is not published. *See* Aplt. App., vol. II, at 338. Because the two rulings are identical in their disposition of the Eleventh Amendment issues, we consolidated the appeals.

denied the motion to dismiss as to those defendants. *See* 996 F. Supp. at 1362-63; Aplt. App., vol. II, at 339. Both sides appeal. We hold that section 11501 is a valid abrogation of Eleventh Amendment immunity and we therefore do not address the district court's application of *Ex parte Young*.

## I

## Eleventh Amendment Immunity

The Eleventh Amendment states that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. The immunity provided by the Eleventh Amendment is not absolute. "A state may consent to be sued in federal court, or Congress may abrogate sovereign immunity. To abrogate Eleventh Amendment immunity, Congress must have 'unequivocally expresse[d] its intent to abrogate the immunity' and 'acted pursuant to a valid exercise of power.'" *Migneault v. Peck*, 158 F.3d 1131, 1135 (10th Cir. 1999) (internal quotations and citations omitted).

In a series of recent cases, the Supreme Court has addressed congressional power to abrogate the immunity provided by the Eleventh Amendment. In *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 59, 65-66 (1996), the Court

concluded that Congress may only abrogate state immunity when it acts pursuant to the legislative authority granted to it by section 5 of the Fourteenth Amendment.  In *City of Boerne v. Flores*, 521 U.S. 507 (1997), the Court analyzed the scope of congressional power under section 5, providing the analysis by which we determine whether a congressional abrogation of Eleventh Amendment immunity is a valid exercise of that power.  In so doing, the Court articulated several governing principles that we set out below as a framework for our consideration of the validity of the abrogation contained in section 11501 of the 4-R Act.

The Fourteenth Amendment restricts the power of the states by providing that

> [n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. CONST. amend. XIV, § 1.  Congressional power to abrogate state immunity is contained in section 5, which provides that "[t]he Congress shall have power to enforce, by appropriate legislation, the provisions of this article."  *Id.* § 5.

In considering the interplay of these two provisions and the scope of Congress' power under them, the Court initially observed that section 5 is a broad grant of authority.  *City of Boerne*, 521 U.S. at 517.

> Whatever legislation is appropriate, that is, adapted to carry out the objects the amendments have in view, whatever tends to enforce submission to the prohibitions they contain, and to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against State denial or invasion, if not prohibited, is brought within the domain of congressional power.

*Id.* at 517-18 (quoting *Ex parte Virginia*, 100 U.S. 339, 345-46 (1879)).

Accordingly, the Court reiterated the principle that "[l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into 'legislative spheres of autonomy previously reserved to the States.'" *Id.* at 518 (quoting *Fitzpatrick v. Bitzer*, 427 U.S. 445, 455 (1976)). Moreover, the Court left undisturbed the principle that congressional action may be upheld under section 5 even when Congress does not expressly rely on that provision as the source of its abrogation power. *See, e.g., EEOC v. Wyoming*, 460 U.S. 226, 243 n. 18 (1983)[2]; *see also Fullilove v.*

---

[2] In holding that Congress need not expressly rely on section 5 for abrogation to be valid, the Court in *EEOC v. Wyoming* distinguished *Pennhurst State Sch. v. Halderman*, 451 U.S. 1, 16 (1981), in which the Court cautioned that "we should not quickly attribute to Congress an unstated intent to act under its authority to enforce the Fourteenth Amendment." In *Pennhurst*, the Court had to determine whether Congress had intended to create substantive rights through unclear statutory language. Thus, its task was "to divine the meaning of otherwise ambiguous intent," in order "to construe a statute, not to adjudge its constitutional validity." *EEOC*, 460 U.S. at 243 n.18. Where, as in *EEOC* and the present case, the congressional intent is clear, "[t]he observations in *Pennhurst* . . . simply have no relevance to the question of whether . . . Congress acted pursuant to its powers under § 5." *Id.*

*Klutznick*, 448 U.S. 448, 478 (1980); *Katzenbach v. Morgan*, 384 U.S. 641, 650-51 (1966); LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 5-4, at 307 n. 6 (2d ed. 1988) ("An otherwise valid exercise of congressional authority is not, of course, invalidated if Congress happens to recite the wrong clause . . . as the source of its power--or, indeed, if Congress recites no clause at all.").

The Court cautioned, however, "that '[a]s broad as the congressional enforcement power is, it is not unlimited.'" *City of Boerne*, 521 U.S. at 518 (quoting *Oregon v. Mitchell*, 400 U.S. 112, 128 (1970) (opinion of Black, J.)). The Court pointed out that congressional power under section 5 is remedial in nature, and confers the authority to enforce the Fourteenth Amendment rather than to define its parameters as a matter of substantive law. *Id.* at 519. While recognizing that the line between remedy and substance is not easy to discern, the Court emphasized that "the distinction exists and must be observed." *Id.* at 520. Accordingly, the Court established several factors to guide an assessment of whether an abrogation of immunity under section 5 is a valid remedial measure or an impermissible substantive change in the governing law.

The Court stated that legislation adopted under the enforcement clause must be judged with reference to the historical experience it reflects, *id.* at 525, and that the "appropriateness of remedial measures must be considered in light of the evil presented," *id.* at 530. In assessing this factor, the Court looked to the

legislative record before Congress as an indication that the congressional action taken was necessary and appropriate. The Court noted that lack of evidentiary support is not conclusive.

> Judicial deference, in most cases, is based not on the state of the legislative record Congress compiles but "on due regard for the decision of the body constitutionally appointed to decide." As a general matter, it is for Congress to determine the method by which it will reach a decision.

*Id.* at 531-32 (citation omitted).

Accordingly, the Court also looked to whether the legislation was proportional to its remedial or preventive object and could thus "be understood as responsive to, or designed to prevent, unconstitutional behavior." *Id.* at 532. The Court cautioned that the sweep of remedial legislation must be congruent with and carefully directed to the scope of the unconstitutional conduct it was enacted to curtail. *Id.* at 532-34.

> This is not to say, of course, that § 5 legislation requires termination dates, geographic restrictions or egregious predicates. Where, however, a congressional enactment pervasively prohibits constitutional state action in an effort to remedy or to prevent unconstitutional state action, limitations of this kind tend to ensure Congress' means are proportionate to ends legitimate under § 5.

*Id.* at 533.

In its most recent examination of Congress' power under section 5, the Court reiterated and applied its holdings in *City of Boerne* that "for Congress to invoke § 5, it must identify conduct transgressing the Fourteenth Amendment's

substantive provisions, and must tailor its legislative scheme to remedying or preventing such conduct." *Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank*, 119 S. Ct. 2199, 2207 (1999). The Court emphasized that while the lack of legislative history showing that Congress was responding to a history of constitutional violations is not determinative, "identifying the targeted constitutional wrong or evil is still a critical part of our § 5 calculus because '[s]trong measures appropriate to address one harm may be an unwarranted response to another, lesser one.'" *Id.* at 2210 (quoting *City of Boerne*, 521 U.S. at 530).

The Court has thus made clear that legislation is more likely to be considered a valid exercise of Congress' section 5 authority if it is supported by a legislative record showing the extent of state conduct violative of the Fourteenth Amendment, and if it is carefully drawn to target that conduct.

## II

### The 4-R Act

With the above general principles in mind, we turn to the validity of the abrogation of Eleventh Amendment immunity contained in the 4-R Act. The substantive provision of the Act upon which the Railroads rely provides:

> The following acts unreasonably burden and discriminate against interstate commerce, and a State, subdivision of a State, or

authority acting for a State or subdivision of a State may not do any of them:

> (1) Assess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.
>
> (2) Levy or collect a tax on an assessment that may not be made under paragraph (1) of this subsection.
>
> (3) Levy or collect an ad valorem property tax on rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.
>
> (4) Impose another tax that discriminates against a rail carrier providing transportation subject to the jurisdiction of the Board under this part.

49 U.S.C. § 11501(b).

The abrogation of Eleventh Amendment immunity which the Railroads contend permits their suit for relief under the Act provides:

> Notwithstanding section 1341 of title 28 [the Tax Injunction Act[3]] and without regard to the amount in controversy or citizenship of the parties, a district court of the United States has jurisdiction, concurrent with other jurisdiction of courts of the United States and the States, to prevent a violation of subsection (b) of this section. Relief may be granted under this subsection only if the ratio of assessed value to true market value of rail transportation property exceeds by at least 5 percent the ratio of assessed value to true market value of other commercial and industrial property in the same assessment jurisdiction. The burden of proof in determining assessed

---

[3] The Tax Injunction Act provides that "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341 (1994).

-10-

value and true market value is governed by State law. 49 U.S.C. § 11501(c).

To determine whether the above provision is a valid abrogation of state sovereign immunity, we must determine whether Congress unequivocally expressed its intent to abrogate, and whether it acted pursuant to a valid exercise of power. *See College Savings Bank*, 119 S. Ct. at 2205. The statute contains an unmistakably clear expression of congressional intent to abrogate state immunity and the parties do not argue otherwise. We therefore must ascertain whether the 4-R Act is a legitimate exercise of Congress' section 5 power.

Following the principles laid down by the Supreme Court, we look first to Congress' identification of the unconstitutional state conduct it intended to remedy in passing the 4-R Act. We begin with the legislative record, which reveals a substantial history of state discrimination in the taxation of railroad property. As the Supreme Court has observed, "[a]fter an extended period of congressional investigation, Congress concluded that 'railroads are over-taxed by at least $50 million each year." *Burlington N. R.R. Co. v. Oklahoma Tax Comm'n*, 481 U.S. 454, 457 (1987) (quoting H.R. REP. NO. 94-725, at 78 (1975)). The legislative history makes clear that the 4-R Act is intended to eliminate "discriminatory State and local taxation of common and contract carrier transportation property . . . as an unreasonable and unjust discrimination against

. . . interstate commerce."  S. REP. NO. 91-630, at 1 (1969).

> In essence, the provisions of [section 11501] are designed to put an end to the widespread practice of treating for tax purposes the property of common and contract carriers on a different basis than other property in the same taxing district.  In describing the extent of discriminatory tax treatment by State and local governments, the Doyle report states that '*despite State laws requiring uniform tax treatment, railroads and pipelines are discriminated against as compared to other property taxpayers in the same jurisdiction*, due in large measure to outdated procedures (which are sometimes deliberately retained) for assessment of property,' and went on to state that [the committee] had information 'showing the extent of overpayment of railroad ad valorem taxes resulting from the assessment of railroad property at a percent of its value that is higher than the percent for the assessment of other taxpayer property is to the value of such other property'; and that 'This confirmed the findings of this committee that there is a studied and deliberate practice of assessing railroad property at a proportion of full value substantially higher than other property subject to the same tax rates.

*Id.* at 2 (emphasis added).  The report also states that "[i]n the last 9 years, the railroads alone have been assessed more than $900 million in discriminatory taxes." *Id.* at 3. Indeed, the legislative history is replete with evidence of widespread, long-standing and deliberate "discriminatory taxation of interstate common carrier transportation property." *Id.* at 4.

The legislative history sets out Congress' findings that the discriminatory state taxation of interstate railroads runs afoul of the constitution in two ways. First, it may violate the rational basis requirement of the Equal Protection Clause by arbitrarily discriminating against a particular taxpayer contrary to "the applicable State laws or constitutional provisions." *Id.* at 7.  Second, it may

-12-

violate equal protection by placing interstate carriers in a separate tax category which, while permitted by state law, impermissibly discriminates against interstate commerce. *Id.*[4]

In addition, Congress took note of the procedural barriers which prevented railroads from obtaining effective relief in state courts. Despite its profound respect for state sovereignty in taxation matters embodied in the Tax Injunction Act, Congress passed section 11501 as an explicit exception to that Act, stating that the effect of the Tax Injunction Act

> has been to close the doors of the Federal courts to carriers affected by discriminatory taxation. It has not, however, insured that the State courts provide carriers with a plain, speedy, and efficient remedy.
>    The testimony before the committee indicated that present State procedures to challenge discriminatory State tax assessments are often difficult, time consuming, and not productive of material relief. For example, the Southern Pacific and its rail affiliates were required to bring 48 separate suits in 48 separate California superior courts to challenge the level of assessments of railroad property by 48 counties and cities in California.

*Id.* at 6-7. In sum, our review of the legislative history convinces us that in passing the 4-R Act, Congress was responding to evidence of a pattern of

---

[4]The legislative history observes that in *Nashville, Chattanooga & St. Louis Ry. v. Browning*, 310 U.S. 362 (1940), the Supreme Court upheld against an equal protection challenge the discriminatory taxation of railroads when based on appropriate state classifications. *See* S. REP. NO. 91-630, at 7 (1969). More recent Supreme Court authority makes clear that arbitrary state discrimination against interstate commerce violates the Equal Protection Clause. *See Metropolitan Life Ins. Co. v. Ward*, 470 U.S. 869 (1984)( discussed in text *infra).*

unconstitutional taxation.

The type of arbitrary state discrimination against interstate railroads in the assessment and collection of taxes that disturbed Congress was subsequently well illustrated in *Allegheny Pittsburgh Coal Co. v. County Comm'n*, 488 U.S. 336 (1989).  There, an assessor's valuation practices resulted in the taxation of generally comparable property at rates different than those applied to the railroad in violation of the state constitutional guarantee of equal and uniform taxation. The Supreme Court held the practice unconstitutional, stating that "'[t]he equal protection clause . . . protects the individual from state action which selects him out for discriminatory treatment by subjecting him to taxes not imposed on others of the same class." *Id.* at 345 (quoting *Hillsborough v. Cromwell*, 326 U.S. 620, 623 (1946)).  Underlying the Court's decision was the state's failure to justify a discriminatory taxing practice as reasonably related to a legitimate state policy when it violated an expressed state policy of equal and uniform taxation.[5]  In this regard, the Court specifically distinguished *Nashville, Chattanooga & St. Louis Ry. v. Browning*, 310 U.S. 362 (1940) (*see supra* n.4).  *Id.*  Thus, Congress'

---

[5] In *Nordlinger v. Hahn*, 505 U.S. 1 (1992), the Supreme Court addressed a taxation scheme which created dramatic tax disparities for properties of comparable value.  The Court found no equal protection violation, holding that the classification embodied in state law rationally furthered a legitimate state interest and that *Allegheny Pittsburgh* was distinguishable on its facts.  *Id.* at 14-15.

concern as set out in the legislative history of the 4-R Act that railroads were the victims of arbitrary discriminatory taxation in violation of state provisions requiring equal and uniform taxation clearly supports the enactment of that legislation under the Equal Protection Clause.

Moreover, classifications that are permitted by state law but result in invidious discrimination against interstate commerce are also properly the subject of remedial action under the Equal Protection Clause. In *Metropolitan Life Ins. Co. v. Ward*, 470 U.S. 869 (1984), the Supreme Court traced the "checkered history" of its "jurisprudence of the applicability of the Equal Protection Clause to discriminatory tax statutes," *id.* at 874, and held that a state violates equal protection when it imposes "'more onerous taxes or other burdens on foreign corporations than those imposed on domestic corporations, unless the discrimination between foreign and domestic corporations bears a rational relation to a legitimate state purpose,'" *id.* at 875 (quoting *Western & Southern Life Ins. Co. v. State Bd. of Equalization*, 451 U.S. 648, 667 (1981)). We thus conclude that the discriminatory taxation of railroads, whether in violation of state provisions or pursuant to them, is a proper object of Congress' power under section 5 to remedy violations of the Equal Protection Clause.

We turn then to the second part of the inquiry mandated by *City of Boerne* and examine whether the provision at issue is tailored to remedying or preventing

the history of constitutional violations set out above.  We begin by observing that, unlike the statute the Court condemned in *City of Boerne*, section 11501 of the 4-R Act is not broad, sweeping legislation that intrudes on state conduct unrelated to the targeted violation.  To the contrary, section 11501 is directed at the discriminatory assessment and collection of railroad taxes, and provides a remedy only when such discrimination passes a threshold of five percent.  Moreover, the Act permits only injunctive relief and further provides that state law is to govern the burden of proof.  The remedy is therefore congruent with and in proportion to the Equal Protection violation.  This congruence between the Act's remedial or preventative means and the legitimate end it seeks to achieve convinces us that it is a proper exercise of Congress' power under section 5.  Accordingly, we join those circuits that have addressed the issue and hold that section 11501 abrogates Eleventh Amendment immunity.  *See Wheeling & Lake Erie Ry. Co. v. Public Utility Comm'n*, 141 F.3d 88 (3d Cir. 1998), *cert. denied*, No. 99-86, 1999 WL 506331, *and* No. 99-234, 1999 WL 3116; *Oregon Short Line R.R. Co. v. Department of Revenue*, 139 F.3d 1259 (9th Cir. 1998).

In holding to the contrary below, the district court in the *Union Pacific* proceeding observed that although Congress need not recite the power under which it passes legislation abrogating Eleventh Amendment immunity, a court must not "'quickly attribute to Congress an unstated intent to act under its

authority to enforce the Fourteenth Amendment.'" *Union Pac.*, 996 F. Supp. at 1361-62 (quoting *Pennhurst State Sch. v. Halderman*, 451 U.S. 1, 16 (1981)).  As we have discussed in note 2, however, the Supreme Court subsequently described this statement as articulating a rule of statutory construction having "no relevance to the question of whether . . . Congress acted pursuant to its powers under § 5." *EEOC v. Wyoming*, 460 U.S. at 243 n. 18.

The district court also relied on the statement in *Wilson-Jones v. Caviness*, 99 F.3d 203, 210 (6th Cir. 1996), that "'in the absence of explicit comment by Congress, only efforts to remedy discrimination against a class of persons that Fourteenth Amendment jurisprudence has already identified as deserving special protection' is properly viewed as legislation passed pursuant to § 5." *Union Pac.*, 996 F. Supp. at 1362.  In so doing, the district court noted that we cited *Wilson-Jones* with approval in *Aaron v. Kansas*, 115 F.3d 813, 817 (10th Cir. 1997).  The court's reliance on *Wilson-Jones* is misplaced for several reasons.

*Wilson-Jones* addressed whether, under *Seminole Tribe*, section 5 authorized Congress to abrogate Eleventh Amendment immunity with respect to violations of the Fair Labor Standards Act.  In holding the abrogation invalid, the court expressly stated that its result might have been different if Congress had made findings that a particular group needed special protection from discrimination.  *See Wilson-Jones*, 99 F.3d at 210 n.4.  Congress did make such

findings in enacting the 4-R Act: "Unfortunately, interstate carriers, especially railroads, are easy prey for State and local tax assessors. Railroads, oil pipelines, and other interstate carriers are nonvoting, often nonresident, targets for local taxation, and cannot easily remove their right-of-way and terminals." S. REP. NO 91-630, at 3.

Moreover, while this court did cite *Wilson-Jones* with approval for one proposition in *Aaron*, we did not adopt or approve the statement relied on by the district court here. Finally, we point out that the Sixth Circuit, in a case subsequent to its decision in *Wilson-Jones*, expressly held that "[t]he Supreme Court's equal protection jurisprudence is not confined to suspect or quasi-suspect classifications." *Coger v. Board of Regents*, 154 F.3d 296, 305 (6th Cir. 1998). The court in *Coger* upheld the abrogation of Eleventh Amendment immunity found in the Age Discrimination in Employment Act (ADEA), stating that

> "[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the state's jurisdiction against intentional and arbitrary discrimination." Thus, the fact that age is not a suspect classification does not eliminate the Equal Protection Clause as a source authorizing Congress to prohibit age-based discrimination; accordingly, Congress did not exceed the scope of its Section 5 authority in enacting the 1974 amendments to the ADEA.

*Id.* (citations omitted). Indeed, "[t]he majority of courts to address this argument have concluded that the mere fact of non-suspect status does not preclude Congress from legislating on a group's behalf." *Little Rock Sch. Dist. v. Mauney*,

-18-

183 F.3d 816, 826-27 (8th Cir. 1999) (listing cases).

The district court in the *Utah Railway* case ruled from the bench in granting the State defendants' motion to dismiss on Eleventh Amendment immunity grounds. The court based its ruling on the fact that Congress invoked the Commerce Clause in passing the 4-R Act, stating "I don't find that this is a case where I am going to work backwards and say, well, Congress could have done it under the fifth section of the Fourteenth Amendment." Aplts. Supp. App. at 400. As we have discussed, however, congressional action may be upheld under section 5 even when Congress does not expressly rely on that provision as the source of its power.

The district court also stated that it was guided by *Nordlinger v. Hahn*, 505 U.S. 1 (1992), where the Supreme Court rejected an equal protection challenge to a state system of taxation. The fact that a particular state taxation scheme passes constitutional muster simply does not inform the inquiry before us. As the Supreme Court reiterated in *City of Boerne*, "[l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into 'legislative spheres of autonomy previously reserved to the States.'" 521 U.S. at 518 (quoting *Fitzpatrick v. Bitzer*, 427 U.S. 445, 455 (1976)). Accordingly, Congress may include conduct that is itself

constitutional in remedial legislation and in so doing may trench upon areas such as taxation that are of particular State concern.

In sum, we conclude that the abrogation of Eleventh Amendment immunity set out in section 11501 of the 4-R Act is a valid exercise of Congress' power under section 5 of the Fourteenth Amendment to remedy violations of the Equal Protection Clause. We therefore hold that the State defendants are not entitled to Eleventh Amendment immunity, and we **REVERSE** and **REMAND** to the district court for further proceedings in light of this opinion.