FISHER, Circuit Judge,
concurring and dissenting.
Though I agree with the judgment to reverse and remand the District Court’s decision, I disagree with my colleagues’ broad interpretation of quasi-judicial immunity. I therefore write separately.
The majority holds that the Pennsylvania Gaming Control Board’s (“Board”) decision to grant two Category 2 gaming licenses was a judicial act subject to absolute immunity. This expands the notion of “judicial.” The Supreme Court has “been quite sparing in [its] recognition of absolute immunity, ... and h[as] refused to extend it any farther than its justification would warrant.” Burns v. Reed, 500 U.S. 478, 486-87, 111 S.Ct. 1934, 114 L.Ed.2d *102 547 (1991) (quotation marks and citations omitted). Today’s decision exceeds the traditional limitations of absolute immunity, creating another barrier to the remedies secured by Section 1983 for deprivations of constitutional rights.
I would instead decide this case on the ground of qualified immunity and hold that the Board members did not deprive Keystone of a well-established constitutional right. For this reason, I agree with our decision to reverse the District Court. But we need not expand the narrow contours of absolute immunity to reach this result. “Absolute immunity ... is strong medicine, justified only when the danger of [officials’ being] deflect[ed from the effective performance of their duties] is very great.” Forrester v. White, 484 U.S. 219, 230, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988) (quotation marks and citation omitted) (modifications in original). There is little reason to hold that the Board members, and similarly-situated executive officials, “may with impunity discharge their duties in a way that is known to them to violate the United States Constitution or in a manner that they should know transgresses a clearly established constitutional rule.” Butz v. Economou, 438 U.S. 478, 507, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).
I.
Keystone brings this action under 42 U.S.C. § 1983, which is written in broad terms. A decision to grant the Board absolute immunity must comport with Section 1983. It applies to “[e]very person” acting under color of state law who deprives any other person in the United States of “rights, privileges, or immunities secured by the Constitution and laws.” 42 U.S.C. § 1983. Absolute immunity is nowhere mentioned in the statute, but it was “solidly established at common law” at the time of passage. Pierson v. Ray, 386 U.S. 547, 553-54, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). The “legislative record gives no clear indication that Congress meant to abolish wholesale all common-law immunities.” Id. at 554, 87 S.Ct. 1213. Absolute immunity therefore rests upon a finding that Congress did not intend to abrogate the common-law traditions. In deciding whether immunity applies, “our role is to interpret the intent of Congress in enacting § 1983, not to make a freewheeling policy choice.” Malley v. Briggs, 475 U.S. 335, 342, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); see also Burns, 500 U.S. at 497, 111 S.Ct. 1934 (Scalia, J., concurring and dissenting) (stating that “we have ... thought a common-law tradition (as of 1871) to be a ... necessary one” for absolute judicial immunity under § 1983 (emphasis in original)); Tower v. Glover, 467 U.S. 914, 920, 104 S.Ct. 2820, 81 L.Ed.2d 758 (1984) (“If an official was accorded immunity from tort actions at common law when the Civil Rights Act was enacted in 1871, the Court next considers whether § 1983’s history or purposes nonetheless counsel against recognizing the same immunity in § 1983 actions.”). At the time of passage, “the touchstone for [absolute immunity’s] applicability was performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights.” Burns, 500 U.S. at 500, 111 S.Ct. 1934 (Scalia, J., concurring and dissenting) (citing Steele v. Dunham, 26 Wis. 393, 396-97 (1870); Wall v. Trumbull, 16 Mich. 228, 235-37 (1867); Barhyte v. Shepherd, 35 N.Y. 238, 241-42 (1866)); see also Antoine v. Byers & Anderson, Inc., 508 U.S. 429, 435-36, 113 S.Ct. 2167, 124 L.Ed.2d 391 (1993).
Absolute judicial immunity was extended to administrative bodies in Butz, 438 U.S. 478, 98 S.Ct. 2894. But it was only extended to administrative bodies that fulfill a judicial function. The Court established *103 an exception to the “general rule [of qualified immunity] for executive officials charged with constitutional violations” in holding “that there are some officials whose special functions require a full exemption from liability.” Butz, 438 U.S. at 508, 98 S.Ct. 2894; Forrester, 484 U.S. at 227, 108 S.Ct. 538 (“[I]mmunity is justified and defined by the functions it protects and serves, not by the person to whom it attaches.” (emphasis in original)).
The Board’s decision to issue gambling licenses is fundamentally different from a judicial decision. Though steeped in formality, the discretionary act of issuing a gambling license to some of several applicants is not the fulfillment of a judicial function. The functional approach to quasi-judicial immunity requires that “[w]hen judicial immunity is extended to officials other than judges, it is because their judgments are ‘functionality] comparable]’ to those of judges.” Antoine, 508 U.S. at 436, 113 S.Ct. 2167 (modifications in original) (quoting Imbler v. Pachtman, 424 U.S. 409, 423 n. 20, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)). To determine whether an act is “judicial,” we must look to the “nature of the act itself, i.e., whether it is a function normally performed by a judge, and to the expectations of the parties, i.e., whether they dealt with the [body] in [its] judicial capacity.” Stump v. Sparkman, 435 U.S. 349, 362, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978). The Board is directed by statute to base its decision upon “whether the issuance of a license will enhance tourism, economic development or job creation [and] is in the best interests of the Commonwealth.” 4 Pa. Cons.Stat. Ann. § 1325(a). Exercising discretion to choose two of five applicants for a license, based on these policy reasons, is not a function “normally performed by a judge.” Judges do not award licenses to competing applicants based on policy preferences. They do not invite public comments and conduct open meetings with members of the public. In holding otherwise, my colleagues’ construction of absolute quasi-judicial immunity fails to conform to the common law traditions of absolute immunity-
Moreover, the decision fails to meet the “touchstone” of serving “the function of resolving disputes between parties, or of authoritatively adjudicating private rights.” Antoine, 508 U.S. at 435-36, 113 S.Ct. 2167 (quoting Burns, 500 U.S. at 500, 111 S.Ct. 1934 (Scalia, J., concurring and dissenting)). The majority glosses over the fact that the proceedings before the Board were not adversarial. In previous cases finding quasi-judicial immunity, administrative bodies served a judicial function: they either resolved a dispute or authoritatively adjudicated private rights.[1] *104 For example, in Butz, the Department of Agriculture sought to revoke or suspend a business license by alleging that it failed to meet minimum financial requirements. 438 U.S. at 481, 98 S.Ct. 2894. It was an adjudication between an agency and a private company in which the right to conduct business was in dispute. The closest case on point from our Circuit is Dotzel v. Ashbridge, 438 F.3d 320 (3d Cir.2006), where a board of supervisors denied an application for a zoning permit by applying a discrete set of legal requirements. We held that the board of supervisors was sufficiently judicial and granted it absolute quasi-judicial immunity. What, in part, distinguishes the board of supervisors in Dotzel from the Board in this case is that the board of supervisors adjudicated a private right, namely, the right to use one’s land. Dotzel had a legal right to his land and sought to exercise his right to use it for mining purposes.
The Board, by contrast, did not adjudicate any private rights. Unlike the board of supervisors in Dotzel, the Board did not authoritatively determine what Keystone or any of the other four applicants could do with their property. Instead, the five applicants sought a privilege. Multiple businesses applied for two casino licenses, and the Board made a discretionary decision, based on policy determinations, to issue the privilege to some and not to others. It was akin to a government agency awarding contracts after a formal bidding process. The distinction between the board proceedings in Dotzel and the Board proceedings in this case is fundamental. In failing to take note of it, the majority risks an expansion of absolute immunity to government functions that are not properly regarded as judicial in nature.
I disagree with the majority’s application of two additional Butz factors: the Board’s insulation from political influence and its use of precedent in making decisions. An administrative body shares the characteristics of the judiciary if it is insulated from political influence. See, e.g., Butz, 438 U.S. at 512, 98 S.Ct. 2894. The majority concludes that “the Board is adequately insulated from political pressures.” Maj. Op. at 98. In Dotzel, we stated that “the key question for our inquiry is ... whether the Board members here can be removed from office based on the substance of their official work.” 438 F.3d at 326. But in this case, the “for cause” provision is not the key question because the short appointment terms fail to insulate the Board members from political influence. The appointing authorities may decide not to reappoint Board members based on the substance of their work. The gubernatorial appointees serve terms of three years, and the legislative appointees serve terms of two years. 4 Pa. Cons.Stat. Ann. § 1201(d). This means that Board members are likely to mold the substance of their work to fit the political views of the appointing authorities.
We must also look to how the Board’s decision-making procedures are structured to determine if it is insulated from political influence. Any action by the Board involving the “approval, issuance, denial or conditioning of any license ... require[s] a qualified majority vote consisting of at least one gubernatorial appointee and the four legislative appointees.” Id. § 1201(f)(1). This means that the “legislative appointees were granted what amounts to a veto power on the Board.” Riverwalk Casino, LP v. Pa. Gaming Control Bd., 592 Pa. 505, 926 A.2d 926, 953 (2007) (Castille, J., dissenting). The combination of the legislature’s veto power on the Board and the two-year appointment term reveals that the legislature exerts indirect control over the Board’s decisions.
*105 Finally, the Board acts in an entirely discretionary manner and is not sufficiently bound by precedent or law to be regarded as judicial in nature. In Dotzel, we understood the question of whether precedent is used in resolving controversies to “be whether the Board’s decisions are purely discretionary, or are constrained by outside law.” 438 F.3d at 326-27. We paid notice that the board of supervisors was “required by statute to consider in its deliberations the land-use standards set out in the relevant zoning ordinance, and to explain its reasoning in written opinions.” Id. at 327. The Board is required to issue written opinions, 4 Pa.Code § 441a.7(u), and to consider the basic eligibility of each applicant. Id. § 1325(b). Beyond this, though, the Board’s decision is entirely discretionary. The Act states that the Board “may” base its decision on several factors:
(1) The location and quality of the proposed facility, including, but not limited to, road and transit access, parking and centrality to market service area.
(2) The potential for new job creation and economic development which will result from granting a license to an applicant.
(3) The applicant’s good faith plan to recruit, train and upgrade diversity in all employment classifications in the facility.
(4) The applicant’s good faith plan for enhancing the representation of diverse groups....
(5) The applicant's good faith effort to assure that all persons are accorded equality of opportunity in employment and contracting....
(6) The history and success of the applicant in developing tourism facilities ancillary to gaming development if applicable to the applicant.
(7) The degree to which the applicant presents a plan for the project which will likely lead to the creation of quality, living-wage jobs and full-time permanent jobs for residents of this Commonwealth generally and for residents of the host political subdivision in particular.
(8) The record of the applicant and its developer in meeting commitments to local agencies, community-based organizations and employees in other locations.
(9) The degree to which potential adverse effects which might result from the project, including costs of meeting the increased demand for public health care, child care, public transportation, affordable housing and social services, will be mitigated.
(10) The record of the applicant and its developer regarding compliance with [Federal, State, and local labor laws.]
(11) The applicant’s record in dealing with its employees and their representatives at other locations.
Id. § 1325(c). In its sole discretion, the Board can base its decision on all, some, or none of the factors. In Dotzel, the board of supervisors was “required by statute to consider in its deliberations the land-use standards set out in the relevant zoning ordinance.” 438 F.3d at 327. But the Gaming Act states that “[t]he board shall in its sole discretion issue, renew, condition or deny a slot machine license.” 4 Pa. Cons.Stat. Ann. § 1325(a) (emphasis added). Furthermore, there is nothing directing the Board to consider its previous decisions. Though there were no prior decisions for the Board members to cite in the Board’s Philadelphia licensing decision, there is nothing to indicate that the Board operates by use of precedent in making decisions. In fact, the highly discretionary nature of the proceedings indicates that decisions are to be made on a case-by-case basis. And this makes sense, *106 given that the Board is not fulfilling a judicial function, but is applying policy preferences to determine the best applicants for casino licenses.
The general rule is to limit the application of absolute immunity to narrow circumstances and to apply qualified immunity to executive officials. Harlow v. Fitzgerald, 457 U.S. 800, 807, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (“For executive officials in general ... our cases make plain that qualified immunity represents the norm”). Butz represents an exception for executive officials who fulfill a judicial function. The majority focuses on the formalities surrounding the Board’s decision and fails to take note of the nature of the decision itself. Deciding the worthiest candidates for business licenses based on policy preferences is categorically not a judicial function. Following the majority’s logic, as long as an executive officer’s decision, whether it be issuing business licenses or granting contracts for paper supplies, is embedded in a sufficiently formal procedure, we must grant that officer absolute immunity. This is contrary to Supreme Court precedent, which requires us to look to “the nature of the act itself.” Stump, 435 U.S. at 362, 98 S.Ct. 1099. The Board members’ position is that they are absolutely immune from any liability, even if they violate one’s constitutional rights and they do so knowingly and deliberately. But in holding that the Board members are immune, the majority risks upsetting the protections embodied in Section 1983. “Under the criteria developed by precedents of th[e Supreme] Court, § 1983 would be drained of meaning were we to hold that the acts of a governor or other high executive officer have ‘the quality of a supreme and unchangeable edict.’ ” Scheuer v. Rhodes, 416 U.S. 232, 248, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (quoting Sterling v. Constantin, 287 U.S. 378, 397, 53 S.Ct. 190, 77 L.Ed. 375 (1932)).
Our system of jurisprudence rests on the assumption that all individuals, whatever their position in government, are subject to federal law: ‘No man in this country is so high that he is above the law.’ ... In light of this principle, ... officials who seek absolute exemption from personal liability for unconstitutional conduct must bear the burden of showing that public policy requires an exemption of that scope.
Butz, 438 U.S. at 506, 98 S.Ct. 2894 (quoting United States v. Lee, 106 U.S. 196, 220, 1 S.Ct. 240, 27 L.Ed. 171 (1882)). The Board members fail to meet the burden of showing that “public policy requires an exemption” from such a foundational principle of governance. Id. For these reasons, I respectfully disagree with the majority’s decision. The Board is not an exception to the rule of qualified immunity.
II.
I believe that we should have decided this case on the ground of qualified immunity and held that the Board members did not deprive Keystone of a clearly-established constitutional right. Whether the Board members should receive qualified immunity is subject to a two-pronged test: a court evaluating a claim of qualified immunity “must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.” Conn v. Gabbert, 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999). The test reflects “the balance that [the Court’s] cases strike between the interests in vindication of citizens’ constitutional rights and in public officials’ effective performance of their duties.” Davis v. Scherer, 468 U.S. 183, 195, 104 S.Ct. *107 3012, 82 L.Ed.2d 139 (1984). Keystone claims that the Board members violated its rights protected by the Commerce Clause and the Equal Protection Clause. Neither claim of a constitutional deprivation was clearly established.[2]
Government officials who perform discretionary duties are “shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” Harlow, 457 U.S. at 818, 102 S.Ct. 2727. This “generally turns on the ‘objective legal reasonableness’ of the action ... assessed in light of the legal rules that were ‘clearly established’ at the time [the action] was taken.” Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (quoting Harlow, 457 U.S. at 819, 102 S.Ct. 2727).
A.
Under the Commerce Clause, Congress has the power to “regulate Commerce ... among the several States.” U.S. Const, art. I, § 8, cl. 3. This clause has an implied requirement — the Dormant Commerce Clause — that the states not “mandate differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.” Granholm v. Heald, 544 U.S. 460, 472, 125 S.Ct. 1885, 161 L.Ed.2d 796 (2005) (quotation marks and citation omitted). In Dennis v. Higgins, the Court held that “individuals injured by state action that violates this [negative] aspect of the Commerce Clause may sue and obtain injunctive and declaratory relief’ and that this “amounts to a ‘right, privilege, or immunity’ under [Section 1983].” 498 U.S. 439, 447, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991).
Dormant Commerce Clause analysis consists of two steps: “whether ‘heightened scrutiny’ applies, and, if not, then ... whether the law is invalid under the Pike [v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970),] balancing test.” Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd., 462 F.3d 249, 261 (3d Cir.2006). Heightened scrutiny applies when a law “discriminates against interstate commerce” in purpose or effect. C & A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383, 390, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994). If heightened scrutiny does not apply, then we consider the Pike balancing test: “whether the ordinance imposes a burden on interstate commerce that is ‘clearly excessive in relation to the putative local benefits.’ ” C & A Carbone, Inc., 511 U.S. at 390, 114 S.Ct. 1677 (citing Pike, 397 U.S. at 142, 90 S.Ct. 844).
The Board stated in its written decision that it “considered the fact of competing Atlantic City properties as a negative factor for licensure in Philadelphia.” (App. at A 194.)
The Board finds it credible that owners of [Atlantic City] casinos ... may attempt to use the Philadelphia property as a gambling-incubator to gain new customers who will then be lured to its Atlantic City properties where it can earn a much larger profit on every dollar gambled. Likewise, the Board finds applicants without Atlantic City connections more strongly motivated to compete directly against the Atlantic City competition because they have no inter *108 est in diverting patrons to the casino which has a better tax structure for the casino.
(Id. at A194.) And it goes on to note why Keystone’s ownership of a casino in Atlantic City serves as a negative factor.
Additionally, evidence has been introduced that the Trump Entertainment properties in Atlantic City[, the parent company of Keystone,] have undergone bankruptcy reorganizations in order to rebuild and revitalize them. The Board believes this further supports its decision to choose other applicants who do not have other facilities so close to Philadelphia which may lure patrons to Atlantic City to assist in the rebuilding and revitalization of properties there.
(Id. at A194.) The Board concludes by stating that it “finds that licensing casinos in Philadelphia which do not have common ownership with Atlantic City facilities are more likely to further the interests of the Commonwealth and the public which stands to benefit through increased revenues obtained by the Pennsylvania properties.” (Id. atA194-95.)
The Board’s decision meets both steps of Dormant Commerce Clause analysis. First, the Board did not discriminate against interstate commerce because it did not impose an absolute barrier to entry of any out-of-state casinos. Cf. Lewis v. BT Inv. Managers, Inc., 447 U.S. 27, 40, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980). In Dean Milk Co. v. City of Madison, the Court held that a denial of a license to sell milk in conformity with a scheme to exclude out-of-state milk “erect[ed] an economic barrier protecting a major local industry against competition from without the State” and “plainly discriminate[d] against interstate commerce.” 340 U.S. 349, 354, 71 S.Ct. 295, 95 L.Ed. 329 (1951). Here, the Board did not erect a barrier to out-of-state competition. It merely considered Keystone’s ties to Atlantic City as a negative factor — one of many factors it considered in the course of its decision. In fact, the two companies that received licenses had extensive out-of-state ties. HSP Gaming is headquartered in Delaware, and Foxwoods is affiliated with a company that owns a large gaming facility in Connecticut. Therefore, the Board’s decision was unlike previous findings of discriminatory intent, where states established absolute barriers to interstate commerce.
Second, the Board’s decision furthers important state interests that outweigh any incidental burdens on interstate commerce. The decision advanced four state interests: (1) the procurement of “a significant source of revenue to the Commonwealth”; (2) “providing] broad economic opportunities to the citizens of th[e] Commonwealth”; (3) “preventing] possible monopolization”; and (4) “enhancing] the further development of the tourism market.” 4 Pa. Cons.Stat. Ann. § 1102. States have a legitimate interest “in maximizing the financial return to an industry within it.” Pike, 397 U.S. at 143, 90 S.Ct. 844. Considering applicants’ ties to Atlantic City as a negative factor due to concerns that it may draw customers away from the state does not constitute a “clearly excessive” burden on interstate commerce. C & A Carbone, Inc., 511 U.S. at 390, 114 S.Ct. 1677. The Board’s decision does not inhibit Keystone or any other Atlantic City casino from attracting Pennsylvania customers. And it does not impose a heavy burden on out-of-state applicants for casino licenses, especially considering that the two successful applicants had significant out-of-state ties. Hence, the Board did not violate the Dormant Commerce Clause and did not deprive Keystone of a constitutionally-protected right.
*109 The Board members should also be held immune because there was not “sufficient precedent at the time of the action, factually similar to the plaintiffs allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited.” McKee v. Hart, 436 F.3d 165, 171 (3d Cir.2006) (quotation marks and citation omitted). There is insufficient precedent that the mere consideration of a company’s out-of-state ties as a negative factor — not a barrier — by an administrative agency violates the Dormant Commerce Clause, especially where the factors of site location and previous experience carried dispositive weight in determining the Board’s decision. Hence, even if the Board’s action did constitute a deprivation of a constitutional right, the lack of clarity in Dormant Commerce Clause jurisprudence prohibited the Board members from being on notice that the use of a negative factor in reaching a discretionary policy determination deprived Keystone of its rights under the Commerce Clause.
B.
The Equal Protection Clause of the Fourteenth Amendment, § 1, directs that no state shall “deny to any person within its jurisdiction the equal protection of the laws.” U.S. Const, amend. XIV, § 1. This “does not forbid all classifications” but “simply keeps governmental decision-makers from treating differently persons who are in all relevant respects alike.” Nordlinger v. Hahn, 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992). The District Court held that Keystone “sufficiently alleged that the [Board] applied the Gaming Act in a way that was designed to benefit in-state business to the detriment of out-of-state competitors.” Keystone Redevelopment Partners, LLC v. Decker, 674 F.Supp.2d 629, 667 (M.D.Pa.2009). The class of casinos with out-of-state ties is not a suspect class, and both parties agree that rational basis review should be applied.
Rational basis review requires us to consider whether “there is a plausible policy reason for the classification.” Nordlinger, 505 U.S. at 11, 112 S.Ct. 2326 (citation omitted). Two questions must be addressed: “first, whether at least one of the purposes of the classification involves a legitimate public interest and, second, whether the classification is rationally related to the achievement of that purpose.” Hancock Indus. v. Schaeffer, 811 F.2d 225, 237 (3d Cir.1987). In making these determinations, we exercise deference and grant discretion to the states. See Pers. Adm’r. of Mass. v. Feeney, 442 U.S. 256, 272, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979).
Keystone challenges the Board’s use of the Atlantic City factor.[3] As stated above, the Board advanced four purposes for the classification: (1) “the procurement of a significant source of revenue to the Commonwealth”; (2) “providing broad economic opportunities to the citizens of th[e] Commonwealth”; (3) “preventing possible monopolization”; and (4) “enhancing the further development of the tourism market.” Appellant’s Br. at 50-51. These purposes derive from the Pennsylvania Race Horse Development and Gaming Act. See 4 Pa. Cons.Stat. Ann. § 1102.
*110 Purposes (1), (2), and (4) can be boiled down to the purpose of promoting domestic industry and the state revenue and tourism that will be derived therefrom. Though states have an undoubtedly legitimate interest in raising revenue and promoting domestic commerce, it is not a “general rule that promotion of domestic industry is a legitimate state purpose under equal protection analysis.” Metro. Life Ins. Co. v. Ward, 470 U.S. 869, 876, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985). The Board’s aim of promoting domestic industry cannot be legitimate if it is “purely and completely discriminatory, designed only to favor domestic industry within the State.” Id. at 878, 105 S.Ct. 1676.
But the Board’s aim was not solely to favor domestic industry within the State. One of the Category 2 licenses went to an out-of-state casino, and the other went to a casino with extensive out-of-state ties. In Metropolitan Life, the Court was concerned with a different form of discrimination: a state tax that was categorically higher for all out-of-state businesses. And since Metropolitan Life, the decision has been “sharply limited to its facts.” Trojan Techs., Inc. v. Pennsylvania, 916 F.2d 903, 915 (3d Cir.1990). Here, the Board was motivated by an interest in promoting local commerce, revenue, and tourism. Moreover, the Board had the legitimate purpose of reducing the possibility of local monopolization. Unlike Metropolitan Life where the state imposed a blanket impediment against interstate commerce, the Board weighed a factor against casinos located nearby based on concerns of local commerce. The Board’s use of the Atlantic City factor is rationally related to the achievement of legitimate public interests, and it passes rational basis review.
III.
I believe that the majority’s broad construction of absolute quasi-judicial immunity is in conflict with Section 1983 and Supreme Court jurisprudence. The Board members are executive officials, and we should apply qualified immunity to their actions. For this reason, I respectfully disagree with my colleagues. But I concur in the judgment to reverse and remand the District Court’s decision, believing that the Board members did not deprive Keystone of clearly-established constitutional rights.

. The majority opinion refers to two district court cases from the Ninth Circuit that involve a gaming commission but are not entirely on point. In a case similar in name but not in substance, the Nevada Gaming Commission initiated suspension proceedings against a gaming employee and denied him a license, revoking his work permit and frustrating "the right to be employed by a licensed establishment.” Rosenthal v. Nevada, 514 F.Supp. 907, 911 (D.Nev.1981); see also Romano v. Bible, 169 F.3d 1182, 1187 (9th Cir.1999) (holding that the Nevada Gaming Commission was subject to absolute immunity because it was sufficiently adversarial in nature and adjudicated disciplinary proceedings against licensees). The Nevada Gaming Commission proceeding is a clear case of a dispute between parties and an authoritative adjudication of a right. The only case which can be construed to support the majority's holding is Kraft v. Jacka, 669 F.Supp. 333 (D.Nev.1987), where the district court held that the Nevada Gaming Commission’s decision to deny a gaming license was protected by absolute immunity and qualified immunity. The court applied both absolute and qualified immunity, thereby failing to resolve whether denying a license to operate a gaming facility is properly considered a judicial function.

. The two prongs of the qualified immunity test may be handled in any order. "The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.” Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009).

. The classification between Atlantic City casinos and non-Atlantic City casinos does not derive from legislation but is created by the Board in reaching its decision. Rational basis review is usually conducted on legislative categories. But it is nevertheless proper here. In a slightly analogous case, a board was alleged to have "utilized an implicit classification in administering its zoning ordinance.” Sylvia Dev. Corp. v. Calvert Cnty., 48 F.3d 810, 821 (4th Cir.1995). There, the court conducted rational basis review of the categoiy, which was created by the board.